(No. 12331.—Reversed and remanded.)

THE WISCONSIN STEEL COMPANY, Plaintiff in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(JOSEPHINE KARCZEWSKI, Admx., Defendant in Error.)

*Opinion filed April 15, 1919—Rehearing denied June 5, 1919.*

1. WORKMEN'S COMPENSATION—*inference that injury arose out of employment must be based on evidence—burden of proof.* The burden is on the applicant to prove that the accident arose out of the employment by direct and positive evidence or by evidence from which such inference can be fairly drawn without being based on mere conjecture or surmise.

2. SAME—*when there is no evidence that accident arose out of employment.* Where the body of an employee is found drowned near the place of his employment two days after his disappearance, and there is no proof, direct or circumstantial, to show why the employee went to the place where he was drowned or how he came to his death, the only conclusion that can be drawn is that the death was accidental, and there can be no inference that the accident arose out of the employment.

CARTER, J., dissenting.

WRIT OF ERROR to the Circuit Court of Cook county; the Hon. OSCAR M. TORRISON, Judge, presiding.

DAVID A. OREBAUGH, (EDGAR A. BANCROFT, of counsel,) for plaintiff in error.

T. A. SHEEHAN, for defendant in error.

Mr. JUSTICE FARMER delivered the opinion of the court:

This was a proceeding before the Industrial Board by Josephine Karczewski, administratrix of the estate of her deceased husband, Felix Karczewski, to recover compensation under the Workmen's Compensation act on account of the drowning of her husband, who was in his lifetime an employee of the Wisconsin Steel Company, plaintiff in error. The Industrial Commission found in favor of the administratrix and entered a finding accordingly. The cause

was taken to the circuit court of Cook county by *certiorari* and the finding of the commission was affirmed. The trial judge certified that the case was one proper to be reviewed by this court, and the cause is here on writ of error.

Plaintiff in error owns and operates a large steel plant covering considerable ground in South Chicago, Illinois. Among its buildings are three cast-houses, in which are located furnaces known as Nos. 1, 2 and "A," and a storehouse in which the tools for making repairs are kept. The Calumet river runs in a northeasterly and southwesterly direction easterly of the cast-houses, and a slip has been made from the Calumet river south of the cast-houses, extending east and west about 1000 feet. Furnace "A" and its accompanying cast-house is situated nearest to and immediately north of the center of the slip. Furnaces Nos. 1 and 2 and their accompanying cast-houses are northeast of furnace "A," No. 1 lying east of No. 2, and the storehouse is located several hundred feet northeast of furnace No. 1, near the westerly bank of the Calumet river. The cast-house containing furnace "A" was about 75 or 100 feet north of the slip. The cast-house containing furnace No. 1 was some 400 feet north of said slip. Felix Karczewski (usually called Joe Pelka and who will be so called in this opinion) had been employed for several years by the plaintiff in error as a pipe-fitter. Each blast furnace consists of the furnace proper and the stove. There are two or more stoves for each furnace. The combustible gases from the top of the furnace are carried off through one of them and the flues of the stove thus heated to an intense heat. The gas is then turned into the other stove, and the blast is blown through the heated stove and enters the furnace at a very high temperature. Thus each stove is alternately being heated by combustible gases from the top of the furnace and being used to heat the air which is blown into the bottom of the furnace. When a blast is in progress the heat around the outside of the furnace, near its base, ranges

from 140° to 150° Fahrenheit. Besides the pipes or conduits through which the gas is carried from the furnace to the stoves and the blast carried from the stoves to the furnace, each furnace is also equipped with two water pipes about a foot in diameter running from the river to the furnace, which carry water to cool the base of the furnace. Pelka's work was to inspect the mechanical parts of the three furnaces and keep them, including the water pipes, in good repair, and occasionally he was called on to assist in repairing the gas pipes also, but he was especially charged with the care of the water pipes which cooled the furnaces. He went to work about five o'clock on the night of September 28, 1916, his duties requiring him to be present at the tapping of the three blast furnaces operated by the company, to repair leaks if any should occur in the water pipes, and to see that all mechanical parts of the furnaces were in repair. The casting of the furnaces consisted in taking the iron from them, which was done by tapping them,— taking out a clay plug at the bottom and running the molten iron into ladles. The record shows that on September 28 Pelka was present at four casts,—at 6:30, 7:30, 9:10 and 10 o'clock, respectively. He was not present at the cast which was made at 11:10 o'clock. One witness, however, testified that he saw him and talked with him about three minutes before 12 o'clock that night, and the wife of the keeper of a saloon outside the steel plant testified to seeing him at her husband's saloon at ten minutes after 10 o'clock that evening. The rule of the plaintiff in error was that no employee should leave the premises at this last named hour without permission of the foreman or his assistant, and none was given Pelka. It appears from the evidence that the only time an employee had a right, under the rule, to go outside of the plant without permission was during the lunch hour, from 12 o'clock midnight to 12:30 A. M., and then only if his card was punched by the timekeeper at the gate, and the record does not show that Pelka went

out through the gate at the midnight lunch hour. He did not appear at the casts that took place at 11:10 and 12:20 o'clock. There is no evidence that tends in any way to show why he was not present at the cast at 11:10 o'clock, for his fellow-employee, Gojyak, testified that he saw him and talked with him a, few minutes before the midnight whistle blew, in the vicinity of furnace No. 2, and so far as the record shows he was never seen alive after that. The foreman testified that he missed him between 11 and 12 o'clock and made a search for him for some time thereafter but could find no trace of him. He was found drowned in the slip about 200 feet west of furnace "A" two days after he disappeared.

The only question presented is whether there is any proof to warrant the conclusion that the accident resulting in Pelka's death arose out of his employment. The evidence shows that when the furnaces were in operation they produced heat around the outside of the base varying from 140° to 150° Fahrenheit; that gases were liable to, and did, escape, which, when inhaled by the workmen, at times necessitated their going or being taken to the door or outside the building to get fresh air. One witness testified he had been taken to the river for air when gassed. Men accustomed to working around these furnaces could not readily detect the odor of the gas and were liable to be overcome or affected by it before they realized that gas was escaping. Pelka was last seen at about 12 o'clock midnight in the vicinity of furnace No. 2, and the witness who saw and talked with him did not testify that there was anything in his appearance or talk to indicate he was then affected by gas. The foreman of the plaintiff in error testified he was around the furnace that night thirteen hours and did not discover any gas. There was no proof that Pelka was affected by gas or heat the night of his disappearance. It is the theory of the defendant in error that Pelka was oppressed by heat or became faint and dizzy from gas, went

288 — 14

to the dock alongside the slip for fresh air, and fell. and was drowned, or if he was in the vicinity of furnace "A" and desired to go to the storehouse, the best route would be along the slip to the river, then along the bank of the river northeast to the storehouse, or if he went on a tour of inspection of the water pipes, that would take him along the dock of the slip. It is said it will not be presumed that Pelka went to the slip or river for pleasure; that the reasonable inference is he went there in the performance of his duties, accidentally fell in and was drowned. There is nothing in the evidence to indicate that Pelka committed suicide or was murdered, but the conclusion is warranted that his death was accidental. Does the proof tend to show that it occurred while he was reasonably fulfilling the duties of his employment or engaged in doing something incidental to it? The burden is on the applicant to prove that the accident arose out of the employment by direct and positive evidence, or by evidence from which such inference can be fairly drawn and without being based on mere conjecture or surmise. (*International Harvester Co.* v. *Industrial Board,* 282 Ill. 489; *Savoy Hotel Co.* v. *Industrial Board,* 279 id. 329; *Central Garage* v. *Industrial Com.* 286 id. 291.) In *Peterson & Co.* v. *Industrial Board,* 281 Ill. 326, we said: "Liability cannot rest upon imagination, speculation or conjecture, upon a choice between two views equally compatible with the evidence, but must be based upon facts established by evidence fairly tending to prove them." The foreman testified there were no repairs made by Pelka the night of the accident; that Pelka had no duties that would take him to the slip, and that he (the foreman) gave him no orders that would require him to go there. Pelka was present when the cast was made at furnace No. 2 at 10 o'clock P. M. but was not present when any of the later casts were made. He was at the Tomecal saloon, outside the grounds of the plant, without permission, ten minutes after 10 o'clock, and was next seen at

or in the vicinity of furnace No. 2 three minutes before midnight but was not present when any other cast was made. There was no proof, direct or circumstantial, to show why he went to the river or slip, or whether he went there in fulfilling any duty of his employment or in doing anything incidental to his employment. The inference is as reasonable from the evidence that he went to the place of the accident as a voluntary act outside the duties of his employment, without the knowledge of his employer, and was drowned, as it is that he was acting in the line of the duties of his employment or engaged in something incidental to it. It can only be surmised or conjectured from the evidence how the accident happened and the reason Pelka came to the place where it occurred. Under all the authorities this is not sufficient upon which to predicate a liability.

The judgment is reversed and the cause remanded, with directions to the circuit court to set aside the award.

*Reversed and remanded, with directions.*

Mr. JUSTICE CARTER, dissenting:

I do not agree with the conclusion reached in the foregoing opinion. The principles involved in the opinion are so important and the facts so necessary to be understood that I am setting them out in this dissent at a little greater length and more in detail than set out in the opinion.

The evidence tends to·show that there was more or less gas around the furnaces while a cast was being made. Workmen who are accustomed to working in the cast-houses become somewhat used to the gas,—acclimated as it were,—so that they cannot detect the odor of gas as readily as one who is only temporarily there, and that frequently the workmen, because they do not appreciate the danger, will thereby be overcome before they realize that gas is escaping. There is evidence tending to show, also, that the air in the cast-houses is worse when there is a good

breeze, and that on the night deceased disappeared there was a wind blowing from the cast-houses towards the slip with a velocity of from sixteen to twenty miles an hour. It appears that when the furnaces are in operation an intense heat around the outside of the base is produced. The evidence tends to show Pelka had theretofore complained of headaches and dizziness, caused by the gas fumes which he had inhaled about his work on the premises. There was evidence tending to show that there was a custom among employees, if they became overheated or gassed, to seek the fresh air outside the cast-houses, and that sometimes they were taken by their fellow-employees to the open places along the river or slip, and that there were no fences or barriers of any description to obstruct the passage of the workmen from the cast-houses to the slip. The evidence shows that after the accident and before the recovery of the body a large boat had been towed west into the slip, and that the body of the deceased was lying just underneath the front of this boat.

There was evidence offered that no gas was noticed in the furnace room by the employees on the night in question. There was also some evidence to the effect that it was not the custom of the employees, when overheated or affected by gas, to go to the river or slip for the purpose of getting fresh air. The foreman testified that the best place to recover from such an attack was in the door of the cast-house, as there was more air moving at that place. There is testimony also tending to show that it was not a hot night at the time of the accident and that deceased was wearing only overalls and jumper. There can be no question, however, from the record, that it is very hot when one is working about the furnaces.

It is conceded by both counsel that the only question at issue is whether the injury causing the death of the deceased took place in the course of and grew out of his employment. While the burden rests upon the applicant to

furnish evidence from which an inference can logically be drawn that the injury arose out of and in the course of the employment, such proof may be made by circumstantial as well as direct evidence. (*Ohio Building Vault Co. v. Industrial Board,* 277 Ill. 96, and cases cited.) It is impossible to lay down any rule as to the degree of proof which is sufficient to justify an inference being drawn, but the evidence must be such as would induce a reasonable man to draw it. Where there is ground for comparing and balancing probabilities at their respective values and where the more probable conclusion is that for which the applicant contends, the arbitrator is justified in drawing an inference in favor of the applicant. (*Peoria Railway Terminal Co. v. Industrial Board,* 279 Ill. 352.) What is evidence of a fact and what is merely guessing at the fact can not be defined by any formula that one can invent. What is wanted is to weigh the probabilities, to see if there be proved facts sufficient to enable one to have some foothold or ground for comparing and balancing the probabilities and their respective values, one against the other. (*Owners of Ship Swansea Vale v. Rice,* 4 B. W. C. C. 298.) There can be no question that the death of Pelka was caused by his falling into the river or slip. There is no evidence in this record in any way tending to show that he was pushed in by some third party, and the presumption here must be against suicide on his part. The evidence shows that he had been in good health and there is an absolute absence of evidence showing suicide, therefore it must be presumed, under the authorities, that his death was accidental. (*Wilkinson v. Ætna Life Ins. Co.* 240 Ill. 205; *Devine v. National Safe Deposit Co.* 240 id. 369; *VonEtte v. Globe Newspaper Co.* (Mass.) L. R. A. 1916D, 641.) It has been held that an employee is engaged in the course of his employment when an injury occurs within the period of his employment, at a place where he may reasonably be and while he is reasonably fulfilling the duties of his em-

ployment or is engaged in doing something incidental to it. (*Dietzen Co.* v. *Industrial Board,* 279 Ill. 11.) The deceased was seen alive and well just before midnight, was not present at the casting of the furnace at 12:20 o'clock and immediately thereafter search was made for him, so it is a fair inference that he was drowned some time between 12 o'clock midnight and 12:30 thereafter, and that the accident occurred during the regular hours of employment, on the premises of plaintiff in error. If there is any evidence fairly tending to show that the duties of deceased, or anything which may be held to be fairly incidental thereto, took him along the slip at the time he fell in, then there can be no question, under the authorities, that the accident arose out of and in the course of his employment. The burden is on the applicant to prove his case. This does not mean that he must demonstrate it beyond all reasonable doubt. It only means that there must be evidence in his favor upon which a reasonable man can act. If the evidence, though slight, is sufficient to make a reasonable person conclude that the deceased fell into the water and was drowned while performing duties in the course of his employment or duties incidental to that employment, then the case is proved. *Marshall* v. *Owners of Ship Wild Rose,* 3 B. W. C. C. 514.

Many cases somewhat similar as to the facts have been decided in various jurisdictions under statutes worded similarly to our own. It has been stated that cases are valuable in so far as they contain principles of law and also to show the way in which the judges regard facts. (*Peoria Railway Terminal Co.* v. *Industrial Board, supra.*) In *Mackinnon* v. *Miller,* 2 B. W. C. C. 64, an engineer on board a small tug, when last seen, was asleep in his bunk at five o'clock A. M. An hour afterwards he had disappeared, leaving his working clothes lying at the side of his bunk. The tug was to move at seven o'clock A. M., and steam had been ordered gotten up for that hour. The deck was a place where between five and seven o'clock A. M.

the deceased was entitled to be. The bulwark was twenty inches in height. Two days afterwards his body, clothed in his ordinary sleeping clothes, was found in the water near the place where the tug had been moored on the morning in question but there was no direct evidence as to how he met his death. It was held that the arbitrator was entitled to draw, as he had drawn, the inference of fact that the deceased had accidentally fallen overboard and was drowned and that the accident arose "out of and in the course of" his employment, and it was therefore not for the court to interfere.

In *Owners of Ship Swansea Vale* v. *Rice, supra,* the deceased was chief officer of the ship, whose duty it was to be employed on the deck." He disappeared in broad daylight, no one having seen him fall overboard, but there was evidence that not long before he complained of a headache and giddiness. It was held by a divided court that there was evidence under which the court might infer that he fell overboard from an accident arising out of and in the course of his employment. In deciding the case in the House of Lords, one of the judges writing the opinion, after discussing various things which might have happened, said (p. 301): "The only other alternative is suicide or murder, and if you weigh the probabilities one way or the other, the probabilities are distinctly greater in favor of the view that this man perished from accident arising out of his employment."

In *Kerr* v. *Ayr Steam Shipping Co.* (1915) App. Cas. 217, a steward of a ship in harbor was lying in his bunk when he was told by the captain to prepare some tea for the crew. Shortly afterwards he was missing. The next day his dead body, dressed only in his underclothes, was found in the sea near the ship. The bulwarks were three feet five inches above the deck. He was a sober man but was subject to nausea. Murder and suicide were negatived by the arbitrator, who drew the inference that the

deceased. went on deck and accidentally fell overboard and was drowned, and held that the accident arose out of and in the course of his employment as steward. The court of session (Lord Guthrie dissenting) reversed the decision on the ground that there was no evidence to support it. The House of Lords by a divided court upheld the finding of the arbitrator, and stated that although upon the evidence it was open to the arbitrator to take a different view, his conclusion was one that a reasonable man could reach, and therefore, even though the court might take a different view if the judges themselves were deciding the question as to the facts, the only duty of the court was to decide whether the conclusion was one that could have been reached from the evidence by a reasonable man.

In *Marshall* v. *Owners of Ship Wild Rose, supra,* an engineer came on board a vessel, which was lying in a harbor basin, shortly after 10 o'clock P. M. Steam had to be gotten up by midnight. He went below and took off his clothes, except trousers, shirt and socks. It was a very hot night. He subsequently got out of his berth, saying he was going on deck for a breath of fresh air. Next morning his dead body was found at the side of the vessel, just under the place where the men usually sat when they went on deck to get fresh air. The county judge found that he came to his death by an accident arising out of and in the course of his employment, and by a divided court his decision was reversed, the court holding that there was no legitimate ground for drawing the inference that he died from an accident arising out of his employment.

In *VonEtte* v. *Globe Newspaper Co. supra,* VonEtte was employed by the newspaper company as a compositor. He went to work on the evening of June 21, 1914, and his employment would have been finished at a quarter before two o'clock the next morning. He was last seen alive about eleven o'clock that evening. His dead body was found the next morning at a quarter before four o'clock upon the

ground, six stories below the floor where he worked. The injuries which caused his death resulted from falling from the roof of the building adjoining the room in which he worked. He was apparently in good health, cheerful in disposition, and there was no evidence tending to show that he had any trouble of any kind. The evidence tended to show that there was an established custom among the employees, known to the employer, to go out upon that roof to obtain fresh air. The Industrial Board found that the accident arose out of and in the course of the employment, there being no evidence that indicated any other cause of death, and the court affirmed the finding.

A reading of the opinions in the cases just cited, a number of them being decided by divided courts, will show how close were some of the questions involved and how difficult it is for all men to agree whether an accident somewhat similar to the one here under consideration arose out of and in the course of the employment. The deceased was the only pipe-fitter working on the night in question. He was required to look after and inspect and keep in good repair all the mechanical parts of the three furnaces and the six water pipes carrying the water from the river to the furnaces. In the performance of these duties, as I understand the record, he necessarily had to travel to and from the three cast-houses, the boiler house, and the storehouse northeast of the cast-houses, and might be required to go to a small storehouse just south of the cast-house in which was located furnace "A" and 70 or 80 feet north of the slip where his dead body was found. There were no regular roads or passageways on these premises. Buildings, railroad tracks, tanks, sheds and structures of all kinds were located wherever convenience demanded. It might be impossible to take a direct course in going from one place to another. It was, however, possible to walk from the western extremity to the eastern extremity of the plant, and it would appear reasonable from the evidence in the

record that in going from one extremity of the plant to the other a workman might think it more convenient to go to the Calumet river and walk on the dock or cement walk alongside the river and the slip. In going from the large storehouse it would not require much of a detour to take the route along the river and slip to furnace "A." The evidence tends strongly to show that there was always liable to be gas in and about the furnaces, and that deceased had complained theretofore to his family about headaches and dizziness caused by inhaling these gas fumes. In addition to the impurity of the air, the heat around the base of the furnaces must necessarily at all times have been somewhat oppressive, ranging from 140° to 150° Fahrenheit, the heat within the furnaces being from 500° to 1500° Fahrenheit. The evidence tends to show that it was a custom, known to the foreman of plaintiff in error, for the men, when oppressed by the heat or troubled by the gas, to go outside the buildings to cool off or get fresh air to counteract the effect of the fumes; that generally the men so overheated or troubled by gas would satisfy themselves by simply stepping outside the cast-house, but that sometimes they would go even to the boundaries of the river or the slip, and that once outside the cast-house there were no fences or boundaries between them and the dock or cement walk alongside the river and slip.

The suggestion offered by plaintiff in error as to how the deceased came to his death is that he fell into the slip while returning from a secret visit to the saloon and while he was intoxicated. This question cannot be raised here, as it was specifically stated on the trial before the Industrial Board that plaintiff in error made no question as to deceased being intoxicated, therefore counsel acting for plaintiff in error cannot for the first time raise that question here. (*American Milling Co.* v. *Industrial Board,* 279 Ill. 560, and cases cited.) Moreover, the direct evidence shows that the deceased was not under the influence of liquor

when he visited Tomecal's saloon a little after 10 o'clock, and his fellow-employee, Gojyak, stated that when he was last seen alive, just before midnight, he was not intoxicated. The suggestion also seems to be made that deceased may have gone down to the river or the slip to look at the stars or for some other reason not connected with his employment. There is no evidence tending to support in any way this theory. If, however, he was oppressed by heat or felt faint or dizzy from gas the dock along the river or slip would be one of the most probable places where he would go for fresh air, or if he were in the vicinity of certain cast-houses and wanted to go to a certain storehouse, one of the easiest and most reasonable routes for him to take would be to proceed along the slip and river.

The authorities all agree that the arbitrator must not surmise, conjecture or guess in reaching his conclusion; that he must infer from the facts actually proven, and that while it is impossible to lay down any rule as to the degree of proof sufficient to justify an inference being drawn, it must be such that the evidence would induce a reasonable man to draw it; that if the facts proved give rise to conflicting inferences of equal degrees of probability, so that the choice between them is a mere matter of conjecture, then the applicant fails to prove his case; but where there is ground for comparing and balancing probabilities at their respective values, when the more probable conclusion is that for which the applicant contends, the arbitrator is justified in drawing an inference in his favor. (*Peoria Railway Terminal Co.* v. *Industrial Board, supra.*) The only question before the court is whether the arbitrator was justified, on the facts proved, in drawing the conclusion that he has drawn. As was stated in one of the opinions in *Owners of Ship Swansea Vale* v. *Rice, supra,* in weighing the probabilities in this case the probabilities are distinctly greater that this man perished through an accident arising out of and in the course of his employment than any of the alter-

natives suggested.  Furthermore, as was said by the court in *VonEtte* v. *Globe Newspaper Co. supra,* on page 643: "A finding by the Industrial Board is not to be set aside if warranted by the evidence although we might feel that a different conclusion would have been reached by us if we had been called upon to decide the question in the first instance.  If this claimant were required to prove all the facts and circumstances attending her husband's death by direct evidence it is plain that her claim would fail.  But she is not limited to such proof.  She may show the existence of such facts as would warrant the inference that her husband did not commit suicide and did not meet with his death as the result of intoxication.  * * *  We can not say that the finding of the board that his death was accidental was not warranted."  The reasoning in the foregoing quotation applies here, and I think that a similar conclusion should be reached.