(No. 13656.—Judgment affirmed.)
THE WASSON COAL COMPANY, Plaintiff in Error, vs. THE
INDUSTRIAL COMMISSION et al.—(J. W. GRIGSBY, Admr.
Defendant in Error.)

*Opinion filed February 15, 1921.*

1. WORKMEN'S COMPENSATION—*what tends to sustain a finding
that death resulted from electrocution rather than disease.* Where
there is no direct evidence as to what caused the sudden death of
a miner while on duty in a mine, evidence that at the place of his
sudden death and within easy contact by him was an uninsulated
electric wire carrying a current sufficient to cause death tends to
sustain a finding that death resulted from electrocution rather than
disease, even though there is evidence that the miner had recently
had an attack of "flu" and complained shortly before his death
of being sick and dizzy, and that he looked and acted sick.

2. SAME—*when cause of death is sufficiently proved.* The cause
of death in a compensation case need not be shown by positive and
direct testimony, but it is sufficient if the facts and circumstances
proved are such that on the whole evidence a reasonable infer-
ence of such cause may be drawn.

WRIT OF ERROR to the Circuit Court of Saline county;
the Hon. A. W. LEWIS, Judge, presiding.

W. C. KANE, for plaintiff in error.

A. W. KERR, J. B. LEWIS, and A. C. LEWIS, for de-
fendant in error.

Mr. JUSTICE FARMER delivered the opinion of the court:
Frank Smith, a miner employed by the Wasson Coal
Company to dig and load coal in its mine, died in said mine
November 28, 1918. His administrator made application
for compensation on the ground that his death was due to
accidental injuries arising out of and in the course of the
employment. Compensation was awarded by an arbitrator,
which was confirmed by the Industrial Commission on re-
view. The cause was then removed to the circuit court by

*certiorari* and the award was by the judgment of the circuit court affirmed. The record is brought here by writ of error.

The only question presented for our determination is whether the death arose out of the employment. Smith died very suddenly in an entry of the mine in the vicinity of his working place. No one saw what caused his death. The light on his cap was seen by a trapper boy sixteen years old, who was seventy or eighty feet distant from him. The light suddenly went out and at the same time the boy heard a noise or struggle, and on going to the place where he heard it, he found Smith lying on the ground in the entry about opposite the mouth of room 11. He hallooed and other parties came to the place very quickly. Smith was not then dead but never spoke, and after a few gasps for breath life became extinct. Defendant in error's contention was and is that deceased came in contact with a live electric wire and was thereby killed. Plaintiff in error's contention is that the electric wire had no connection with his death but that he died from heart failure, resulting from a recent attack of the "flu."

The roof of the mine at the place where Smith's body was found was about six feet high. Two uninsulated wires were strung on poles in the entry for furnishing power to the machines. One wire was positive and the other negative. The positive or live wire was about six inches below the roof and the dead wire about a foot lower. They were fastened to posts eleven or twelve feet apart. When Smith was first found he was lying on his face, with his miner's cap-bill down over his eyes and nose. His head was a foot or two from the rail of the track, which was seven or eight feet from the rib. Smith was about six feet tall, and his feet extended toward the side of the entry in front of the mouth of room 11. There were some abrasions on his nose or chin. There was no indication of a burn. The proof shows deceased had not worked in the mine for a few days prior to his death.

Everett Foster, who was also employed in the mine, testified he saw Smith standing directly in front of room 11 three or four minutes before his death. Witness was room boss. Smith was looking for a driver. Witness asked him where he had been, as he had been off several days. Smith replied he was not able to work that day; that he was feeling awful bad and was dizzy. The witness passed on and had gone about two hundred and fifty feet when he heard the trapper boy hallooing and went back to where he had seen Smith. When witness reached him he was lying on the ground at the same place where he had talked to him, with his head on the lap of a man named Johnson, and was dead. Witness testified that when Smith told him he was not feeling well he was pale and did not look to be strong. Another witness, Walker, who worked in the same territory Smith did, testified that the morning of the day of Smith's death he was walking with him in the mine and Smith said he was feeling bad and could not walk very fast; that he was just getting out of bed with the "flu." Marshall, a mine examiner, testified he saw Smith in the mine the morning of his death. He was in room 12 and told witness he felt dizzy. Witness noticed that when he stooped down to get a pick he did not seem to find where the pick was lying and reached to the side of it, like he could not see. "He looked funny out of his eyes." Hicks, the boy trapper referred to, testified he saw Smith as he was going to work the day of his death. He told witness he had been sick and that he helped dig a grave the day before; that he would load a car or two, or maybe three, and then go home; that he was sick and not able. He seemed like he felt bad. He was working in room 12 and had a car loaded and told witness to tell the driver. "He had been out some before this day; said he felt bad."

The testimony does not show how long Smith had been sick with the "flu" nor how violent the attack was. The period of his absence from the mine is referred to as "sev-

eral days," "some days" and "a few days.", Medical witnesses testified the effects of the "flu" were impairment of the nervous system, heart, respiration and circulation, and where the attack was severe, especially if complicated with pneumonia, was liable to produce paralysis of the heart and sudden death. These results did not usually follow a slight attack of "flu." One doctor testified he had had one case of such sudden death where the attack was slight,—not complicated with pneumonia,—but that such a result is not likely to occur and is an exception to the rule. The same doctor testified a man who had been weakened with the "flu" would be more susceptible to an electric current. This testimony, together with the fact that there was no indication of a burn on the body of Smith, is the basis of plaintiff in error's contention that the death did not arise out of the employment. The burden was on the applicant to prove by direct and positive evidence, or by evidence from which such inference can be fairly drawn, without being based on mere conjecture or surmise, that the accident arose out of the employment. (*Wisconsin Steel Co.* v. *Industrial Com.* 288 Ill. 206.) In *Peterson & Co.* v. *Industrial Board,* 281 Ill. 326, it was said: "Liability cannot rest upon imagination, speculation or conjecture,—upon a choice between two views equally compatible with the evidence,—but must be based upon facts established by evidence fairly tending to prove them." To the same effect are *Savoy Hotel Co.* v. *Industrial Board,* 279 Ill. 329, and *Mepham & Co.* v. *Industrial Com.* 289 id. 484.

Defendant in error contends the evidence fairly brings the case within the above rule, as the facts and circumstances proved fairly tend to show that the death resulted from accidental contact with a live electric wire. As we have said, two uninsulated wires were strung along the entry next to the rib in front of the mouth of room 11. The track in the front part of that room had been removed and it was no longer used as a haulage-way. The usual

way to get to the face of the coal in rooms 11 and 12 was through room 12, but there was no gob or obstructions at the mouth of room 11 and one could get to the face of the coal through that room. The upper wire across the mouth of that room, in front of which Smith's body was found, was a live wire and was about six inches below the roof. It carried a voltage of 120 to 275. The testimony fairly showed that electrocution is not always indicated by a burn; that electrocution sometimes occurs without leaving a mark on the body. The trapper boy testified he was at the body of Smith within two or three minutes after he heard the noise and saw Smith's miner's lamp disappear; that he looked up and one of the electric wires was vibrating, but he couldn't remember which one. There was no testimony that the abrasions on the deceased's face were burns, but some of the medical and other testimony was that the marks had been examined by the witnesses and might have been made by the electric wire. Two of the witnesses who were at the body before life was extinct testified it was damp. In view of Smith's condition of health and dampness of his body it is contended he was very susceptible to an electric current. He was about six feet tall, which would bring his face about to the height of the live wire. One of the wires was vibrating when the trapper boy reached the body, which would indicate that it had just been hit by something, and there was nothing else that could have caused the vibration and no one was there but Smith. One witness testified for plaintiff in error that he put his bare hand on the live wire and received no severe shock; that the wire felt warm and he could tell it carried an electric current. The proof further was to the effect that some men are much more susceptible to an electric current than others, and a current which may be fatal to one would not be to another.

As tending to discredit the testimony of the trapper boy that the wire was vibrating when he reached the body

there was testimony for plaintiff in error that fine dust had settled on the wire and had not been disturbed; also that a test had been made as to how long the wire would vibrate when struck and that it would not vibrate more than about a minute. We do not regard that testimony of much importance. The dust that might adhere to a wire would not be reliable evidence that the wire had not vibrated, for it would hardly be sufficient in quantity to be disturbed in that manner.

No autopsy was held, and it may be admitted that the proof does not show with absolute certainty just what caused the death. The undisputed fact remains that Smith did suddenly die from some cause. There was at the place of his sudden death and within easy contact by him an electric wire carrying a current which is not disputed to have been of sufficient voltage to cause death. We have above stated the substance of the testimony relating to the effects of "flu" and the possibility of sudden death resulting from it. To our minds that death resulted from that cause is much more remote and less probable than that it resulted from deceased's contact with the electric wire. We do not think it can be said the two views are equally compatible with the evidence. The cause of death need not be shown by positive and direct testimony, but it is sufficiently shown if the facts and circumstances proved are such that on the whole evidence the reasonable inference to be drawn is that it arose out of the employment. (*Smith-Lohr Coal Co.* v. *Industrial Com.* 286 Ill. 34.) It has been repeatedly held that we cannot weigh the evidence and determine upon which side it preponderates, but it seems to us to require more conjecture and speculation to say from the testimony that the death did not result from electrocution than to say it was so caused.

The judgment is affirmed.    *Judgment affirmed.*