LAURA MAE SPARKS, Appellee, v. CONSOLIDATED INDIANA COAL COMPANY, Appellant.

**MASTER AND SERVANT:** Workmen's Compensation Act—Conjec-
1    tured Cause of Death. The burden resting on a claimant for compensation for the death of a workman to prove, not only (1) that the workman received an injury which ''arose out of'' the employment, but (2) that such injury was the cause of the death, is not met (a) by proof that the workman dropped dead at his post of duty, or (b) by proof of an injury, admittedly arising out of the employment, but of such a trifling nature that, in view of the entire record, the *effect* of such injury is a mere matter of imagination—conjecture—guess.

**MASTER AND SERVANT:** Workmen's Compensation Act—Unsup-
2    ported Finding. A finding by the industrial commissioner as to the cause of death of a workman is subject to review by the courts when such finding has no other basis than a *conjecture.* So held where a workman dropped dead at his post of duty.

*Appeal from Marion District Court.*—H. S. DUGAN, Judge.

NOVEMBER 21, 1922.

REHEARING DENIED FEBRUARY 17, 1923.

ACTION for an award of compensation under the Work-

men's Compensation Act.  The committee of arbitration, the industrial commissioner, and the district court allowed the award.  The employer appeals.—*Reversed.*

*Sargent, Gamble & Read,* for appellant.

*N. D. Shinn,* for appellee.

FAVILLE, J.—The claim for award is made by the widow of the employee.  The workman was a coal miner, 48 years of age, and had a wife and five children.  On the day of the injury, he was working in the mine in the same room with his son, 19 years of age.  There was nothing out of the ordinary in regard to his health and physical condition on the day of the injury.

1. MASTER AND SERVANT: Workmen's Compensation Act: conjectured cause of death.

He had made no complaints.  The decedent operated a drill by hand power.  It consisted of a straight rod, with a crank on the side, which was turned by the operator.  The decedent began work about 8 o'clock in the morning, and had worked about two hours before his death.  In operating the drill, he was on his knees, leaning against the drill, his face being turned in a slanting direction downward toward the floor.  The son was about 30 feet from him, with his back toward the decedent.  He heard the drill stop, and turned around, and went immediately to his father.  As soon as he reached decedent, he found him lying partly on his back and partly on his side, with his face toward the ceiling.  There was an abrasion of the skin on the right side of the nose, from which blood was exuding, and also a spot described as "scratches" on the right temple, which was also bleeding.  It appears from the evidence that in the roof of the room where these parties were employed was a substance known as kobo, which is something like dirty coal.  The ceiling was 7½ feet high; and on the morning of the day in question, the employee and his son had taken down kobo from the ceiling and piled it up on the floor.  There was a layer about a foot and a half thick on the roof over the place where the decedent was employed.  There was evidence that there were pieces of kobo lying on the floor in the room, varying in size from those as large as one's fist to 2½ feet square.  The de-

cedent was lying on the pile of kobo that had been taken down and piled up that morning by the decedent and his son. He was not, however, lying under the place in the ceiling from which the kobo had been taken that morning.

The son testified that he did not notice any new pieces, aside from those that had been taken down that morning. He also testified that he noticed the drill which his father was operating, stop suddenly, and he heard a noise, "a kind of rattling noise,—sounded like kobo falling;" and that he heard this noise just a couple of seconds after the drill stopped. He testified that kobo makes a creaking sound before it drops, and that he was familiar with the sound, and that the sound he heard that morning was similar to the sound made by kobo when it breaks and falls. This drill was about three feet in front of decedent, and was still in the hole in the face of the coal vein, after he was found.

The mine physician who examined the body of the decedent at the time testified that the skin on the nose was peeled a little, and that there were a couple of little marks on the right temple. He testified that the cuts and scratches on the face were skin deep only, and that no bones were broken; that neither the nose nor the skull was fractured. He testified that there was nothing in the nature of the injuries which he observed, to produce death. The mark on the side of the head was at the junction of the frontal and temporal bones, and the witness testified that the thinnest bones in the skull are around the temple, and are probably from one-eighth to one-quarter inch thick, in a normal person. He testified that, in his opinion, there was no fracture of the bones of the skull of decedent, but that this could not be determined absolutely by an ordinary examination, but only by an X-ray examination, and that no such examination was made. He testified that a blow on the head could not cause death unless the inner table of the skull was broken, but that this could be broken and not be visible on the outside. He gave it as his opinion that the skull of the decedent was not broken on the inside by anything that produced the marks on the temple. He made a manual examination of the injury on the temple, but could not observe any depression at that spot.

The coroner, who was also a physician, and who examined

the decedent, died before the hearing, and his testimony was not secured.

The physician testified to being present when the coroner performed an autopsy, which consisted of opening the decedent's chest and making an examination of his heart and lungs. No further examination was made, and nothing abnormal was discovered in these organs.

There was also evidence showing that the decedent had been for some time addicted to the use of intoxicating liquors, and had been seen intoxicated several times, but that he had not been drinking the morning of his death.

The doctor testified as an expert, in regard to alcoholism, gastric ulcers of the stomach, and arteriosclerosis, and said that, in his opinion, the decedent would have died if he had not received any blow; that he might have died from cerebral hemorrhage, or the perforation of an ulcer. He also testified that he could not say what caused the decedent's death, but concluded with the statement: "It might have been a number of different things."

The coroner's jury returned a verdict that the death of the decedent "resulted from natural causes." This verdict was offered in evidence.

The appellant challenges the sufficiency of the evidence to sustain the finding of the industrial commissioner. In cases arising under the Workmen's Compensation Act, the burden of 2. MASTER AND proof rests on the claimant to establish that SERVANT: Work- the injury sustained by the employee was one men's Compen- sation Act: un- "arising out of and in the course of the employ- supported find- ing. ment." Section 2477-m, Code Supplement, 1913; Chapter 270, Acts of the Thirty-seventh General Assembly; *Flint v. City of Eldon,* 191 Iowa 845. This burden is not discharged by creating an equipoise. *Griffith v. Cole Bros.,* 183 Iowa 415.

Where the evidence is in conflict, the finding of the industrial commissioner is final and conclusive. *Hughes v. Cudahy Pkg. Co.,* 192 Iowa 947; *Pierce v. Bekins Van & Storage Co.,* 185 Iowa 1346; *Pace v. Appanoose County,* 184 Iowa 498; *Hanson v. Dickinson,* 188 Iowa 728; *Jackson v. Iowa Tel. Co.,* 190 Iowa 1394; *Norton v. Day Coal Co.,* 192 Iowa 160; *Miller v. Gardner*

& Lindberg, 190 Iowa 700; Rish v. Iowa Portland Cement Co., 186 Iowa 443; Flint v. City of Eldon, supra; O'Neill v. Sioux City Term. R. Co., 193 Iowa 41; Kraft v. West Hotel Co., 193 Iowa 1288.

The finding of the commissioner must be based on evidence that may be either direct or circumstantial and on the reasonable inferences that may be drawn therefrom. It cannot, however, be predicated upon conjecture, speculation, or mere surmise. In Clapp's Parking Station v. Industrial Acc. Com., (Cal.) 197 Pac. 369, the court said:

"The Workmen's Compensation Act creates a liability against an employer only for an injury 'arising out of and in the course of the employment.' Stats. 1917, p. 834, Section 6, Subsec. a. The fact that the injury arose out of and in the course of the employment is a condition precedent to the power of the commission to award compensation to the injured employee or a death benefit to his dependents. An award made without proof of this essential fact is void; and, if attacked by certiorari, as provided in Section 67 of the law, it must be annulled as an act in excess of the commission's jurisdiction. The statute, it is true, expressly declares that the conclusions of the commission on questions of fact are 'conclusive and final and shall not be subject to review' (Section 67 of the Act, Subsec. c). But this means no more than that the commission is the final arbiter, where there is a conflict in the evidence or where opposing inferences may reasonably be drawn. It is always within the province of the court, in reviewing an award based wholly on circumstantial evidence, to determine whether there are inferences reasonably deducible from the evidence, to sustain the commission's findings. The findings, in such case, must be based on reasonable inferences; conjecture or guesswork will not suffice."

See, also, Wasson Coal Co. v. Industrial Com., 296 Ill. 217 (129 N. E. 786); Von Ette's Case, 223 Mass. 56, 59 (111 N. E. 696); Wisconsin Steel Co. v. Industrial Com., 288 Ill. 206 (123 N. E. 295); Peterson & Co. v. Industrial Board, 281 Ill. 326 (117 N. E. 1033); Gentelong v. American Hide & Leather Co., 194 App. Div. 9 (184 N. Y. Supp. 808); Ohio Bldg. S. V. Co. v. Industrial Board, 277 Ill. 96 (115 N. E. 149).

We regard the foregoing rules as well established in cases

of this kind.  The difficulty lies in applying them to the facts of any particular case.  It is obvious that other cases, cited as precedents on fact questions, are valuable only as illustrating the manner in which courts have dealt with a somewhat analogous state of facts.  *Owners of Ship Swansea Vale v. Rice,* L. R. App. Cas. (1912) 238; *Peoria R. Terminal Co. v. Industrial Board,* 279 Ill. 352 (116 N. E. 651).

In the instant case, there is no direct evidence whatever as to the cause of the workman's death.  It rests wholly on circumstantial evidence and the inferences that may be drawn therefrom.  Is there sufficient evidence, with all proper inferences legitimately to be drawn therefrom, to warrant a finding that the death of the workman resulted from personal injuries arising out of and in the course of his employment?  If there is such evidence, the finding of the commissioner will be sustained, even though, on a consideration of the facts, we might reach a different conclusion.  It cannot, we think, fairly be said that there is any conflict in the evidence in this case.  There is no substantial dispute in regard to the physical facts, nor is there any in regard to the expert testimony, in so far as it throws any light on the cause of the employee's death.

Under our statute, to justify an award three things must be shown by evidence, direct or circumstantial, including all reasonable presumptions and inferences.  These are:  (1)  That the employee suffered a personal injury;  (2)  that the injury was one "arising out of his employment;"  and (3)  that the injury was one arising "in the course of his employment."  The expressions "arising out of" and "in the course of" are not synonymous.  An injury may be received in the course of the employment, and still have no causal connection with it so that it can be said to arise out of the employment.  *State v. District Court of St. Louis County,* 129 Minn. 176 (151 N. W. 912); *Hopkins v. Michigan Sugar Co.,* 184 Mich. 87 (150 N. W. 325); *Larke v. John Hancock Mut. Life Ins. Co.,* 90 Conn. 303 (97 Atl. 320); *Archibald v. Workmen's Comp. Com.,* 77 W. Va. 448 (87 S. E. 791); *McNicol's Case,* 215 Mass. 497 (102 N. E. 697); *Rayner v. Sligh Furn. Co.,* 180 Mich. 168 (146 N. W. 665); *Walther v. American Paper Co.,* (N. J.) 98 Atl. 264.

In this case, the claimant contends that the employee re-

ceived a personal injury which caused his death, and that such injury was received in the course of and arose out of said employment.

It must be conceded that the employee came to his death while engaged in the course of his employment. That is to say, he was at his post in the mine, at his proper work of drilling, when he died. As the industrial commissioner aptly states in his finding: "A well man one moment, a dead man the next." At this point, we are confronted with the question as to whether or not the mere fact that death comes to a workman while in the course of his employment is sufficient, without other proof, to support an inference that such death resulted from a personal injury, and that said injury arose out of the employment.

For the purpose of the discussion at this point, we are assuming that there was no evidence of physical injury to the employee from which it might be inferred that the same resulted in his death. In *Hills v. Blair*, 182 Mich. 20 (148 N. W. 243), it is said, by way of dictum:

"When the employee dies at his post of duty, a presumption may reasonably be entertained that he was then performing his duty, and engaged in the work for which he was employed, from which a causal relation between his employment and the accident may be inferred."

A somewhat similar general statement is to be found in 1 Honnold on Workmen's Compensation 219. We think the rule as thus stated is too far-reaching and inclusive. The mere fact that an employee is found dead at his post, without *any* evidence whatever as to the cause of death, cannot, we think, either logically or legally support an inference that the employee suffered "a personal injury" from which death resulted. This is going too far. It is making the employer an insurer of his employee,—something that the statute does not do. Such a holding would be in conflict with the rule announced, that the burden rests upon the claimant to establish that there was a personal injury to the employee, in the course of and arising out of the employment, for which compensation may be awarded. The mere proof of death at the post of duty, without anything more, is not sufficient to carry the burden, and establish liability.

In this case, however, there is evidence of physical injury

to the employee.  Assuming, for the sake of the argument, that it may be properly inferred that said injury occurred ''in the course of the employment,'' and that it ''arose therefrom,'' we come squarely to the proposition: ''Did such injury cause the death of the employee, for which death compensation is claimed?''  There were two injuries on the head of the employee: one the abrasion of the skin on the nose; the other, the ''scratches'' or laceration over the right temple.  No claim is or can be made for the injury on the nose, as either causing or contributing to the death of the employee.  Is there any evidence from which it may legitimately be inferred that the injury to the temple, whether by blow or otherwise, resulted in the employee's death?  Is the fact *alone* that a man is found dead, with a wound of some kind upon his temple, sufficient to support an inference that death resulted from the blow, fall, or other thing which caused the wound?  The location, character, extent, and probable effect of the wound, and the thing which produced it, must, of necessity, be considered in determining the ultimate and final question as to the cause of death.  The fact of physical injury alone is not sufficient.  It may have been trifling in extent, or in a nonvital part, as the abrasion of the skin on the nose of the employee in this case.  In such case, there is physical injury and death, but no proof, by inference or otherwise, of any causal connection between the two.  But here was an injury in the region of the temple, which is a more or less vital part.  Did this injury cause the employee's death?  The fact that an injury to the temple may or may not be fatal must depend necessarily upon the extent and character of the injury.  No inference can legitimately be drawn that ''a scratch,'' even in the region of the temple, could produce instant death.  Common knowledge would negative any such inference at once.  Was there any evidence in this case that the injury to the employee's temple was of such a character that it could have produced death?  Is there proof of any fact from which it may fairly be inferred that it did produce death?  When we go to the record, we find that this injury is described by the widow of the employee, the claimant herein, as follows:

''There was a place on his right temple that looked like it was hit with a sharp instrument.  Before he was buried, it

turned purple. The skin was broken on his right temple in a place about as big as the end of my little finger. The end of my little finger just fit in the place where the skin was broken. I did not examine it close. There was a sunken place in the temple where I pressed my little finger, and my finger sunk in about the thickness of this pencil [indicating an ordinary lead pencil] ; about a quarter of an inch. I am sure the sunken place was not there before. The skin was broken on his nose. And there was another place close by the one on the temple that I have described, that looked like it was broken through; and there were cut places on his face. The places on his nose looked like gashes. I did not examine the other temple.''

The physician testified:

''The skin on his nose was peeled a little, and there was a couple of little marks on his temple. After they brought the body to his home, I examined him. The cuts and scratches on his face were skin deep only, and the bones were not fractured. The skin was scratched on the temple. The nose was not broken, and the skull was not fractured. Q. In your opinion as a doctor, state whether or not the death of Riley Sparks was the result either of the scratches on the nose or the scratches on the temple, or both. A. I thought not. There was nothing in the nature of the injuries to produce death. The mark on the side of his head was at the junction of the frontal and temporal bones. The thinnest bones in the skull are around the temporal, probably one eighth to a quarter of an inch thick, in a normal person. I did not investigate how thick the bones were in the head of Riley Sparks. In my opinion, there was no fracture; but of course I could not determine this absolutely by an ordinary examination. An X-ray might have disclosed a fracture, if one existed. A blow on the head could not cause death unless the inner table was broken. By 'inner table,' I mean the inside of the skull. The inside of the skull could be broken, and still not be visible on the outside. Q. Basing your answer on your experience as a doctor, and from your examination of Riley Sparks, what is your opinion as to whether or not the skull of Riley Sparks was broken on the inside by a blow, or whatever other cause might have produced the scratches on Sparks' temple? A. In my opinion, it was not. The only evidence I

could find of any injury was that the skin was peeled a little on his nose, and there were a couple of little scratches and abrasions of the skin, in the right temporal region.   I made a manual examination of that spot, but did not observe, either visually or by the manual examination, any depressions on that spot. There was no fracture of the nose bone,—just a skin abrasion. I considered the wound on the head slight, and not sufficient in itself to have caused death.   I do not think the scratches were the cause of death, and I give that answer, basing my conclusion on my experience as a physician.''

There is really no substantial conflict in this evidence.   Giving to it the most favorable construction, with every legitimate inference that can properly be drawn therefrom, we think there is no evidence to justify a conclusion that the workman died as the result of the injury to his temple.   It certainly is not a matter of common knowledge that a wound such as is described, on the temple of the deceased, would result in death.   There is no evidence in behalf of claimant that such a result is even pos-sible,—not to say probable.   The only testimony whatever on the subject, aside from the description of the injury, is that of the physician, who expresses the opinion that the injury in question did not produce death.

Unless we are to hold that the fact of the injury itself, and its location, character, size, condition, etc., are sufficient to warrant an inference that death resulted therefrom, then the claimant has not made a prima-facie case of liability.   The evidence, instead of sustaining such a conclusion, rather has a tendency to negative it.

We are not oblivious of the fact that the provisions of the Workmen's Compensation Act are to be liberally construed, and that the general rule is to award compensation, rather than to deny it, where the evidence will justify a conclusion that a workman has received compensative injury; but the fact of a compensative injury must be established by legitimate and proper proof.   As before stated, it cannot be the result of conjecture, speculation, or mere guess.

In this case, there must be found in the record proof to justify a conclusion that the workman suffered a personal injury from which death resulted.   Taking into consideration all

of the evidence in behalf of the appellee in regard to the injury to the employee, and every inference legitimately to be drawn therefrom, we cannot say that there is any evidence to sustain the appellant's contention that the workman died as a result of the injury to his temple. There is no proof whatever that the character, location, and extent of the injury were such that any fair inference could be drawn therefrom that it produced the death of the employee. Without some such evidence, the claimant has failed to carry the burden necessary to establish liability.

Holding, as we do, that there is no sufficient proof to establish the fact that the injury to the workman resulted in his death, it is unnecessary for us to speculate upon the question as to how the injury may have been inflicted.

The conjecture is suggested that the workman may have heard a noise of kobo about to fall, and threw his head back to look at the ceiling, and was struck in the face and temple by a piece of falling kobo. This is the merest speculation and conjecture. There is no proof whatever that any kobo fell from the ceiling in the vicinity of the place where the workman was employed. The injury may have happened in the way suggested, or it may have happened in some other and different way. We fail to find that the claimant has produced any evidence from which it may fairly and legitimately be said that the decedent received a personal injury which resulted in his death, and for which compensation should be awarded.

It is unnecessary that we pass upon the question suggested by the appellant, that the cause of decedent's death may have been a cerebral hemorrhage, brought on primarily by the use of alcohol, or that it might be due to a gastric ulcer. Whatever speculation in which we might see fit to indulge in this respect would be entirely futile and useless. The only question is whether the appellee produced any evidence to warrant the finding that the death of the workman resulted from the personal injury described in the evidence. There was a failure of proof to warrant such a conclusion, and it therefore follows that compensation should have been denied.

The judgment appealed from is—*Reversed*.

PRESTON, ARTHUR, and DE GRAFF, JJ., concur.