### WILLIS C. SANDERSON'S (dependent's) CASE.

Suffolk.    April 6, 1916. — June 29, 1916.

Present: RUGG, C. J., BRALEY, DE COURCY, CROSBY, & PIERCE, JJ.

*Workmen's Compensation Act.*

Where a plumber's assistant, who had been sent by his employer to do some work for a customer that lived four miles away and was returning in the afternoon with a horse and wagon of his employer, was seen driving on the highway in a normal condition and five minutes later his unconscious body was found in the roadway at the left of the wheel tracks with a cut over the eye and a contused surface around it and bruises on the back of the head and on a shoulder and the horse with the wagon attached was found some distance away jogging along up the road, and where such employee died without recovering consciousness and an autopsy showed that all the organs of his body were in normal and healthy condition, that there was no diseased condition of the heart and that there had been a hemorrhage which had caused his death, it was *held,* that the cause of the employee falling from the wagon, if he did fall, was purely a matter of conjecture and that there was no evidence on which it could be found that the death of the employee was the result of an injury arising out of his employment within the meaning of St. 1911, c. 751, Part II, § 1.

CROSBY, J.    This is an appeal from a decree of the Superior Court,* based on a decision of the Industrial Accident Board ordering the Globe Indemnity Company to pay the sum of $2,025

---

* Made by *Pierce,* J.

to Fannie E. Sanderson, the widow of Willis C. Sanderson, for his death.

The findings of the arbitration committee in substance were, that Willis C. Sanderson was a general workman, a plumber's assistant, employed by one Black; that on January 22, 1913, at 1.30 o'clock in the afternoon he left the shop of his employer in South Deerfield to go to Whately, a distance of about four miles, to do some work at the house of one Fleming, a customer of his employer; that he left the house of Fleming at five o'clock that afternoon with a horse and wagon of his employer to return to the shop in South Deerfield; that he was seen by one Connelley as he was driving on the highway leading from Whately to South Deerfield, apparently in a normal condition; "that five minutes later Connelley came upon his unconscious body lying in the roadway to the left of the wheel tracks; that his head was pointing south and his feet towards the north; that a blanket was found more nearly in the middle of the roadway, north of his feet; that Connelley saw the horse and wagon some distance away, jogging along up the road; that Connelley called Sanderson by name, but obtained no sign of recognition; that he then lifted his head and Sanderson groaned once; that Sanderson was lying on his right side, his right arm underneath him, and he partly rolled over when he groaned . . . that Sanderson's eyes were partly open; that he appeared to be unconscious."

The arbitration committee further found that he was taken to the Greenfield Hospital where it was found that there was a cut "over the right eye, an inch or an inch and a half in length, extending into the hair on the front of the head, and at its deepest point extending through the scalp to the skull and causing a slight hemorrhage from the periosteum; that there was a contused surface around the cut for about three inches; that there were black and blue marks found on the back of his hand and on the shoulder; . . . that the autopsy revealed that all the organs in the man's body were in normal and healthy condition; that there was no evidence of a diseased condition of the arteries or the heart; that the brain was examined . . . that it was found that there was a hemorrhage in the lateral ventricles and in the third and fourth ventricles; that it was found that the ventricles and the spinal canal were gorged by the hemorrhage and that the hemorrhage caused death." He died about three o'clock the next morning.

The committee further found, "There was no direct evidence tending to show how or in what manner Sanderson fell from the wagon. There was no positive evidence as to whether the hemorrhage did occur before or after he fell from the wagon, but from the circumstances as disclosed by all the evidence, we find as a fact that Sanderson either fell or was thrown from the wagon, while he was in the employ of said Black, returning from his work with his tools, to the shop of said Black, in South Deerfield, and that the cut and contusion which was found on his head immediately after the fall, and the black and blue spots, found on his shoulder and hand, were made by the fall."

The committee therefore found upon all the evidence, that Sanderson's death "was due to accident, while he was acting for his employer in the course of his employment."

Upon a claim for review, the Industrial Accident Board affirmed and adopted the finding of the committee and found upon all the evidence as follows: "That the employee, Willis C. Sanderson, received a personal injury arising out of and in the course of his employment, by reason of having been thrown from the wagon in which he was seated. The position of his body when found showed that he did not fall inertly from his seat, as would have been the case had he sustained an apoplectic shock preceding and causing the fall. The weight of all the evidence showed that he was thrown by an accident, and not by a stroke of apoplexy or other natural cause; and that he was thrown from the wagon by the sudden moving or starting of the horse, the horse having been found trotting along about three quarters of a mile away within five minutes from the time the employee had been seen driving him along the road. The body was found on the side of the road, beyond the beaten wheel tracks, where he would not naturally be found if he had fallen inertly because of a stroke of apoplexy; his head was pointing in a direction opposite to that in which he was driving. He was unconscious, evidently on the spot on which he struck, on his fall from the wagon. . . . The preponderance of all the medical and circumstantial evidence shows that a trauma preceded and caused the hemorrhage which resulted in the death of the said employee, and the board so finds."

It is plain that the injury was received while the employee was engaged in the regular work which it was his duty to perform

and so was received "in the course of his employment," under the meaning of Part II, § 1 of St. 1911, c. 751.

The more difficult question is, did the injury arise out of the employment under the same section of the act?

In *McNicol's Case*, 215 Mass. 497, it was said by the Chief Justice speaking for this court, that an injury "'arises out of' the employment, when there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury. Under this test if the injury can be seen to have followed as a natural incident of the work and to have been contemplated by a reasonable person familiar with the whole situation as a result of the exposure occasioned by the nature of the employment, then it arises 'out of' the employment. But it excludes an injury which cannot fairly be traced to the employment as a contributing proximate cause and which comes from a hazard to which the workmen would have been equally exposed apart from the employment. The causative danger must be peculiar to the work and not common to the neighborhood. It must be incidental to the character of the business and not independent of the relation of master and servant." *Milliken's Case*, 216 Mass. 293.

The Industrial Accident Board have found that the injury arose out of the employment, and it is expressly provided by § 11 of Part III of the act as amended by St. 1912, c. 571, § 14, that the decree entered in the Superior Court "shall have the same effect and all proceedings in relation thereto shall thereafter be the same as though rendered in a suit duly heard and determined by said court" except that there shall be no appeal upon questions of fact. The findings of fact made by the Industrial Accident Board are equally conclusive with the findings of a judge, or the verdict of a jury, and are not to be set aside if there is any evidence to support them. *Pigeon's Case*, 216 Mass. 51. The Industrial Accident Board in the determination of questions of fact is permitted to draw such inferences from the evidence and all the circumstances as a reasonable man could draw, but its findings cannot properly be based merely upon conjecture or speculation. *Von Ette's Case*, 223 Mass. 56. *Sponatski's Case*, 220 Mass. 526.

The burden of proof rests upon the dependent to prove the facts

necessary to establish a right to compensation under the act. As was said in *Sponatski's Case, supra,* "The dependent must go further than simply to show a state of facts which is as equally consistent with no right to compensation as it is with such right. They can no more prevail if factors necessary to support the claim are left to surmise, conjecture, guess or speculation, than can a plaintiff in the ordinary action in tort or contract. A sure foundation must be laid by a preponderance of evidence in support of the claim, before the dependents can succeed."

After a careful examination of the evidence presented to the arbitration committee and to the Industrial Accident Board, all of which is reported, we are of opinion that the dependent has failed to sustain the burden of proof by showing that the employee received an injury which arose out of his employment and that resulted in his death.

While there was ample evidence from which it could have been found that, so far as could be ascertained, the employee was in ·a normal and healthy condition, without any impairment of his arteries, or disease of any of the organs of his body, and that it was unusual for a man of his age to suffer a cerebral hemorrhage unaccompanied by some physical injury, still there seems to be an entire absence of evidence to show that the hemorrhage was caused by the fall from the wagon. It could have been found that the blow upon the head was sufficiently severe to have caused the hemorrhage, but there is no evidence to show that such injury did produce the hemorrhage. In other words, a finding that the hemorrhage preceded the fall and caused the employee to fall from the wagon is as consistent with the evidence as is a finding that the hemorrhage was caused by the fall.

So far as the record discloses, no one saw the deceased that day while he was in the wagon on the highway, except Connelley, who saw him driving along, and about five minutes afterwards found him lying in the roadway in an unconscious condition. There is an entire absence of evidence to show how he got out of the wagon. The Industrial Accident Board finds that "he was thrown from the wagon by the sudden moving or starting of the horse;" the reason given for this conclusion being based upon the place where the body was found and its position upon the road. We are of opinion that such evidence would not warrant a finding that the

deceased was thrown from the wagon by the sudden starting of the horse. There is no evidence whatever that the horse did so start.

Many conjectures could be made as to the cause of the fall of the deceased, if he did fall. He might have fallen while standing up in order to wrap the blanket about him; he might have accidentally dropped his reins and lost his balance while leaning forward to pick them up; the horse might have shied; he might have fallen from weariness or sleepiness; or, as the insurer contends, he might have had an apoplectic seizure which produced the cerebral hemorrhage and caused his fall.

It is plain that if the hemorrhage was due to natural causes, and was not produced by the fall, it could not be found to be an injury arising out of the employment.

It is plain that the inference drawn by the Industrial Accident Board from the evidence, that the hemorrhage followed the injury and resulted therefrom, is based merely upon surmise, speculation and conjecture, and does not rest upon a foundation of proof by a preponderance of the evidence. It may be the dependent is correct in her contention that the death of the employee was due to a fall from the wagon, but other theories and conjectures are quite as probable. *Milliken's Case, ubi supra. Williams* v. *Citizens' Electric Street Railway,* 184 Mass. 437. *Thackway* v. *Connelly & Sons,* 3 B. W. C. C. 37. *Barnabas* v. *Bersham Colliery Co.* 3 B. W. C. C. 216. *Perry* v. *Ocean Coal Co. Ltd.* 5 B. W. C. C. 421. *Jenkins* v. *Standard Colliery Co. Ltd.* 5 B. W. C. C. 71. *Wood* v. *D. Davis & Sons, Ltd.* 5 B. W. C. C. 113. *Butler* v. *Burton-on-Trent Union,* 5 B. W. C. C. 355. *Charvil* v. *Manser & Co. Ltd.* 5 B. W. C. C. 385. *Marshall* v. *Owners of Steamship Wild Rose,* [1910] A. C. 486. *Rodger* v. *Paisley School Board,* 5 B. W. C. C. 547. *Robson, Eckford & Co. Ltd.* v. *Blakey,* 5 B. W. C. C. 536. *Lewis* v. *Port of London Authority,* 7 B. W. C. C. 577.

The recent case of *Carroll* v. *What Cheer Stables Co.* 38 R. I.421, is distinguishable from the case at bar. The workmen's compensation act of Rhode Island, unlike ours, and like the English act, provides that the injury must be sustained by an employee by "accident." In that case the employee, a hack driver, while helpless from dizziness or unconsciousness occasioned from a disease from which he was suffering, was thrown

from his seat; there was direct evidence from an eyewitness that his horse ran against the curbstone and he fell off. It was held that the fall was an accident arising out of his employment within the meaning of the act. See also *Wicks* v. *Dowell & Co. Ltd.* [1905] 2 K. B. 225; *Owners of Steamship Swansea Vale* v. *Rice,* 4 B. W. C. C. 298; *Moore* v. *Manchester Liners, Ltd.* 3 B. W. C. C. 527.

The decree of the Superior Court must be reversed and a decree entered declaring that the dependent is not entitled to compensation.

*So ordered.*

The case was submitted on briefs.

*J. T. Connolly & M. J. Mulkern,* for the insurer.

*F. J. Lawler,* for the dependent widow.