MARY JANE JONES, Appellee, v. EPPLEY HOTELS COMPANY et al., Appellants.

No. 39913.

OCTOBER 22, 1929.

*Chandler Woodbridge,* for appellants.

*Robert B. Pike* and *L. F. Brown,* for appellee.

KINDIG, J.—There is but one question presented in appellants' argument. It is: Did the cause which produced the death of James William Jones, the claimant's deceased husband, "arise out of his employment" with the Eppley Hotels Company, as contemplated by Section 1377 of the 1927 Code?

The Martin Hotel, in Sioux City, is owned and operated by the appellant Eppley Hotels Company, and the appellant London Guarantee & Accident Company, Limited, is the compensation insurance carrier for the Eppley Company. Mr. Jones, for a considerable time before his death, had been working for the appellant Eppley Hotels Company, at the Martin Hotel, and, on the morning of July 24, 1928, he continued such duties until, in the course thereof, he became unconscious. In that condition he was found on the floor of the hotel kitchen, at about 6 A.M. From there he was taken to the hospital, where consciousness was regained. However, at about 5:30 o'clock in the afternoon of July 25th, Jones again became unconscious, and thus remained until he died, at 8 o'clock in the morning of the following day. Alice, a daughter, four years old, and Mary Jane Jones, the widow, both survived the decedent. Claim for compensation is here made by the widow. Is she entitled to it? If so, it is because her husband's death resulted from an injury arising

out of his employment. Section 1377, 1927 Code, supra; *Sparks v. Consolidated Ind. Coal Co.*, 195 Iowa 334.

To prove this essential fact, the burden is upon the claimant, appellee. *Sparks v. Consolidated Ind. Coal Co.* (195 Iowa 334), supra; *Flint v. City of Eldon*, 191 Iowa 845; *Griffith v. Cole Bros.*, 183 Iowa 415; *Pentony v. Dudley*, 197 Iowa 744; *Slack v. Percival Co.*, 198 Iowa 54. This obligation she must meet by a preponderance of the evidence, as distinguished from that proof which will satisfy beyond a reasonable doubt. *Flint v. Eldon* (191 Iowa 845), supra. The duty of determining where the preponderance of evidence lies, under the records in cases of this kind, is the task imposed by statute upon the state industrial commissioner. If there is no fraud, and that official acts with power, and not in excess thereof, and his findings support the order and decree, it cannot be interfered with on appeal to the district court unless "there is not sufficient competent evidence in the record to warrant the making of the order or decision." Section 1453, 1927 Code; *Flint v. City of Eldon* (191 Iowa 845), supra; *Hinrichs v. Davenport Locomotive Works*, 203 Iowa 1395.

Putting the thought in another way, it is not the province of the district court, or this tribunal, to usurp the power of the commissioner and act in his place and stead as a trier of the facts. That thought is expressed in *Flint v. City of Eldon* (191 Iowa 845), supra, as follows:

"It is not within the legislative scheme to make a court the reviewer of the facts, and it has been repeatedly held that the court is forbidden to trespass upon the defined jurisdiction of the commissioner, the latter being the sole judge and the final judge of the facts."

With whom the preponderance lies, is a question for the commissioner; that there is or is not competent evidence which may give rise to a preponderance, is a problem for the court. Mere speculation and conjecture do not amount to such substantial evidence. *Sparks v. Consolidated Ind. Coal Co.* (195 Iowa 334), supra; *Slack v. Percival Co.* (198 Iowa 54), supra.

Assuming, then, that the commissioner's finding is supported by mere speculation or conjecture only, it can be reviewed by the courts. Under the present record, because of the narrow

scope of appellants' argument, the question at bar will be solved by deciding whether the commissioner acted on a mere speculation or conjecture alone. Consideration of the facts will settle this controversy; for, on the one hand, appellee insists that her husband met his death by a cerebral hemorrhage caused by a fall, while, on the other, appellants contend that apoplexy, or something akin thereto, produced the hemorrhage.

Jones, the decedent, was approximately 57 years of age, and in good health, except for pains or neuritis in his legs. These ailments were not serious. Previous to the unconsciousness above named, decedent had not been in an accident, or in any other way injured. On the morning of July 24, 1928, Mr. Jones, in accordance with his duty, was working at the Martin Hotel as ice man: that is, "he cut the ice" into cubes, so that it could be "used in the dining room." After thus cutting the cubes, Mr. Jones placed them in a bushel basket, which he then carried from the basement into the kitchen, where he deposited the contents in a chest provided therefor. Commencing this duty at about 5:18 on the morning of July 24th, he continued for an indefinite period.

Wallace Lebeck, an employee of Roberts Dairy Company, stopped at the hotel to deliver milk about 6 o'clock A.M., and found Jones in an unconscious condition on the kitchen floor. More particularly, this witness discovered the unconscious man "right in front of the coffee urns * * * lying flat on the floor, with his feet to the south, and his head resting on a brace which supports the coffee urn stand." Continuing, this witness said:

"This brace was made of gas pipe, and it was parallel with the floor, and six or eight inches above the floor. The back of his [Jones's] head was resting on this pipe. His face was up * * *. There was a bushel basket lying there. As near as I [the witness] can remember, it was directly south of him. There was some cracked ice on the floor and some in the chest. There was no ice in the basket. I [the witness] don't know what kind of a floor that is, but it is a smooth hard finish."

Dr. C. J. Goebel, house physician for the hotel, was called to attend the stricken man. Upon viewing the patient, the physician immediately sent him to St. Joseph's Hospital. Two hours later, the attending physician called on Mr. Jones there. Soon

thereafter, Jones regained consciousness, and his reflexes were normal and all present. He could answer questions, but "did not seem to remember just what happened to him." A slight contusion was found at the base of the skull. Whether there was any other injury to the exterior of the head, the record does not disclose. Continuing, the attending physician said:

"His [Jones's] face, eyes, ears, nose, and mouth were negative. There was nothing wrong with his neck. The thorax was normal, spine apparently [all right], lungs normal, abdomen and kidneys negative. The anus, rectum, and genitalia and extremities were negative. Central nervous system and skin were negative. His temperature on the first day in the hospital was 99.4. Pulse 70, respiration 20."

An examination by stethoscope disclosed a normal heart. Likewise, two blood tests were made, and revealed a negative condition. So, too, a Wassermann test was taken, which was also negative. Following Jones's death, on July 26, 1928, a post-mortem examination, as shown by this witness, was conducted by Dr. Starry. Thereby was disclosed "hemorrhage into the ventricles; the aqueduct filled with clotted blood; the meninges of the mesial surface of both hemispheres was filled with blood; there was no advanced arteriosclerosis of the basalar vessels." Further testifying, Dr. Goebel said, in answer to a hypothetical question, that the hemorrhage was due to trauma, and that trauma, rather than an apoplectic stroke, probably caused the death. Also, this witness said that the cerebral hemorrhage might have resulted from a fall against the pipe. Concluding, the witness stated:

"From my examination made, and the history that I have obtained of this case, hypothetical questions, I think it more probable the cause of his injury was trauma than from any other cause."

Support for the foregoing testimony was furnished by Dr. R. N. Larimer, who said:

"I believe the trauma had some direct bearing on the patient's condition. * * * I don't believe he had a stroke of apoplexy. * * * I believe that this injury to the patient must

have been traumatic, and that trauma was the primary cause of his death. * * * This impression is not mostly speculation."

A. C. Starry, another doctor, further substantiated the previous witnesses. Notation is here made that this physician performed the autopsy. In describing what he there found, the witness says:

"On examination of his [Jones's] brain, we found a hemorrhage into the ventricles, and also an area of hemorrhage into the meninges, the central portion, extending down to the corpus callosum, the medial surface of the two hemispheres. That was, of course, the cause of death. * * * This hemorrhage was in the center or top of the head, located in the ventricles of each hemisphere of the cerebrum. * * * There was another hemorrhage in the lining or covering of the brain, extending down in between the two hemispheres where they come together. An area of hemorrhage in the covering of the brain,—as we say, the meninges. * * * Spontaneous apoplexy usually is not found in a multiple area, usually found in one area. * * * Probably the multiple hemorrhage which I found indicates an accident or trauma of some kind, prior to his being found unconscious. * * * I couldn't find anything [in the post-mortem examination] that I could be satisfied indicated that this man suffered what is known as spontaneous apoplexy. * * * The two areas of the hemorrhage were in the upper and front part of the brain. * * * I can say he [Jones] may have had apoplexy, but I feel the weight of evidence is a little more the other way. * * * It is not likely that there would be a weakened or diseased condition of some small portion of some blood vessel in the brain, without being any evidence of a weakened condition or sclerosis of the other blood vessels in that same brain. * * * I couldn't find any aneurysms in this case. * * * When I gave it as my opinion, upon direct examination, that it was more probable that this condition which I found in this man's brain was due to traumatic reasons, rather than other reasons, I based that opinion on the evidence and findings of the case. * * * I have in good faith given an opinion as to the probabilities, and that it is more favorable to a traumatic origin than any other cause [and this] is not based on conjecture and speculation. * * * I feel that, if there had been aneurysm there, I would have detected it in the

meningeal section. The vessels are rather distinct in the meninges.''

Important in this connection is the fact that there was a multiple hemorrhage. Apoplexy and causes of that kind, according to the doctors, as stated and restated in the record, produce but a single hemorrhage, while trauma results in the double. The meninges were affected. Hemorrhage was found there, as well as in the ventricles. Doctors consider the multiple hemorrhage, under the circumstances, quite important. Strong support is furnished for the commissioner's conclusion by the fact that there was a multiple hemorrhage, and that trauma, generally speaking, as distinguished from apoplexy, alone could cause it. No evidence of apoplexy or any cause except trauma was discovered by the physicians who testified, as above related.

Such, in a general way, is the record upon which the claimant relies for an affirmance. Embraced therein, she contends, is sufficient substantial evidence to support the commissioner's finding. Restating the thought in another way, the claimant, appellee, insists that there is such substantial testimony that the commissioner was authorized, in exercising his authority, to declare where the preponderance thereof lies. We are constrained to agree with her in this regard.

While no one saw Jones fall in the hotel kitchen, yet it is morally certain that he did so. Viewing the entire record, as we must, including the ice on the floor and all the other facts and circumstances, together with the medical testimony, it appears that there is a basis for the commissioner's conclusion. *Hinrichs v. Davenport Locomotive Works* (203 Iowa 1395), supra; *State Compensation Ins. Fund v. Industrial Acc. Com.*, 195 Cal. 174 (231 Pac. 996); *Sparks Mill. Co. v. Industrial Com.*, 293 Ill. 350 (127 N. E. 737); *Santa v. Industrial Acc. Com.*, 175 Cal. 235 (165 Pac. 689); *Dean v. Benton Harbor-St. Joe R. & L. Co.*, 231 Mich. 23 (203 N. W. 952); *Sanderson's Case*, 224 Mass. 558 (113 N. E. 355); *Uzzio's Case*, 228 Mass. 331 (117 N. E. 349).

Possibly the commissioner was wrong in his decision. Another result might or might not have been reached by us, had it been our duty to make a finding. That is not the question. There was substantial evidence in the record, and it was the province of the commissioner to say with whom it preponderated. Ac-

cordingly, that official so did; and this court, under the circumstances, cannot interfere therewith.

Nevertheless, appellant earnestly argues that Doctors Goebel, Larimer, and Starry were not certain. This is true, but they did say that the probabilities were favorable to the trauma theory. Starry, the doctor who performed the autopsy, on cross-examination, in discussing the subject, said: ''I had better keep within the word 'possibly.' '' Again, he said that he was conjecturing. Yet, considering his testimony as a whole, it is very evident that the witness intended to express the probabilities; for on redirect examination he said:

''I am not using the proper word—the probabilities—I am deducing the probabilities, you understand. I am not saying that it did [the injury caused the ruptured blood vessel],—I couldn't say that; but the fact that he [Jones] had no disease that I could explain this hemorrhage, and the fact as to there being two areas of hemorrhage there, I deduce from that, that the evidence is more than he probably did have an accident or injury there.''

Further support is found in the testimony of Dr. F. A. Ely that the commissioner acted on mere conjecture, because it is surmised the hemorrhage might have been caused by aneurysm. Ely, as a witness, explained that ''aneurysm is a 'blowout' of a blood vessel, due to some weakening of the walls.'' Also, Dr. Ely complained because the doctor who performed the autopsy did not discover the exact vessel severed. However, Dr. Ely did not pretend to say that aneurysm was the cause of Jones's death in this case. Some doubt is expressed by this doctor concerning the correctness of the finding made by the other doctors previously named, regarding the multiple hemorrhage; but this is a mere doubt, for Dr. Ely makes it plain that he does not intend to contradict Dr. Starry, who made the post-mortem examination. Dr. Ely did not examine the deceased. Theorizing further, Dr. Ely suggests that a blow on the head will affect the brain, if at all, at the place of injury, or in the region directly opposite therefrom, but will not disturb other portions thereof. Conversely, Dr. Starry said he found no evidences of aneurysm, although he searched for it; and while the exact vessel severed was not discovered, yet the

areas thereof were found and recognized. Whether Jones received an injury to any part of his head except at the base of the skull, does not appear in the record. Conceding, without deciding, that a blow on the head will only injure the brain at the point of contact, or at the region immediately opposite the same, yet, for the purposes of this theory, the location of the place opposite from the impact will depend entirely upon the angle of the blow. However, it was said by Ely that the probabilities were in favor of apoplexy, rather than trauma. But, in modification of such opinion, Dr. Ely says that, if there was a multiple hemorrhage, that fact would point to trauma, instead of apoplexy.

While in some respects Dr. Ely contradicted the testimony of the other physicians, yet, on the whole, there can be considerable reconciliation. Conflicting evidence usually appears in litigated cases. Imposed upon the industrial commissioner was the duty of settling this dispute, and in so doing, it was his province to determine which testimony was to be believed. Generally speaking upon the subject of disputes in expert testimony, we said, in *Hinrichs v. Davenport Locomotive Works* (203 Iowa 1395), supra:

"While there is disagreement in the testimony of the expert witnesses, it was peculiarly the province of the industrial commissioner to accept the testimony of such of these witnesses as seemed to him most consistent with all the testimony, and of the greater credibility."

A California court, in *State Compensation Ins. Fund v. Industrial Acc. Com.*, 195 Cal. 174 (231 Pac. 996), supra, likewise suggests:

"Petitioner assails the acceptance of expert testimony on the ground that it is too insubstantial to sustain the award in this case. The rule as to the value of such evidence is well settled. Expert testimony is often the only testimony available. Especially is this true in cases where the truth is occult, and can be found only by resorting to the sciences. Such testimony is to be given the weight to which it appears in each case to be justly entitled. The law makes no distinction between that kind of testimony and evidence of other character."

1290

Another California court declared, in *Santa v. Industrial Acc. Com.*, 175 Cal. 235 (165 Pac. 689), supra:

"This [expert medical testimony] was substantial testimony, justifying the commission's inference and finding that the injury had been the proximate cause of Cordova's death. It is true that, on cross-examination, Dr. Ophuls said he could not state that, in fact, there had been an embolus, and that his explanation of the cause of death was 'guesswork.' But a reading of his entire testimony shows that he did not, by this, mean to say that he was indulging in mere conjecture or speculation. He was giving what, on the facts before him, and in the light of medical science, appeared to be the most probable explanation of the event. The theory that an embolus arising from the injury had caused the death was 'guesswork' only in the sense that there was no direct evidence of the existence of such embolus. But, in Dr. Ophuls' view, other conceivable causes were excluded by the conditions which were shown, and the one which he advanced remained as the most probable one. This was a sufficient basis for the action of the commission."

Manifestly, if mathematical exactness were required, or should the demand be that the claim be established beyond a reasonable doubt, there could be no room for the preponderance of evidence rule. Absolute certainty is not necessary. All requirements in the case at bar were met when the appellee furnished substantial proof upon which the commissioner found the preponderance of the evidence in her favor. Appellee's evidence aforesaid is not overcome by the mere suggestion of appellants that the theory of apoplexy, or some other cause, may be responsible for Jones's death. If, after a weighing of the probabilities, the balance is in favor of appellee, it is sufficient. Such is the criterion in negligence cases tried before a jury. We said, in *George v. Iowa & S. W. R. Co.*, 183 Iowa 994:

"The true test is well stated in *Schoepper v. Hancock Chemical Co.*, 113 Mich. 582 (71 N. W. 1081), wherein it is said that the rule where the case rests wholly in conjecture does not apply, if there is room for balancing the probabilities and for drawing reasonable inferences better supported on one side than the other, even though the evidence for the theory of plaintiff is rebutted, but without disclosing any other probable cause."

Likewise, we declared in *Gordon v. Chicago, R. I. & P. R. Co.*, 146 Iowa 588 (at page 594):

"The case so made is not to be disposed of by the suggestion that other reasonable theories may be advanced to explain plaintiff's injury. Even in a case depending on circumstantial evidence alone to establish negligence, the plaintiff is not bound to negative every other conceivable theory or hypothesis which ingenuity may invent to account for his injury. It is only where opposing theories are equally reasonable and equally consistent with the proved or admitted facts that plaintiff must fail as a matter of law."

The rule in compensation cases does not place a greater burden on the claimant than that required of the plaintiff in a negligence case tried before a jury. Probabilities may be balanced in the compensation proceeding, as well as in the negligence case. *Uzzio's Case*, 228 Mass. 331 (117 N. E. 349), supra; *Dean v. Benton Harbor-St. Joe R. & L. Co.*, 231 Mich. 23 (203 N. W. 952), supra; *Santa v. Industrial Acc. Com.*, 175 Cal. 235 (165 Pac. 689), supra. An illustration of this thought is expressed in the *Santa* case, supra, in this way:

"But, * * * other conceivable causes were excluded by the conditions which were shown, and the one * * * advanced remained as the most probable one. This was a sufficient basis for the action of the commission."

Of course, appellee's alleged probability must have substantial support in the evidence, and when thus sustained, it may be weighed against the theory advanced by the appellant. Thus the industrial commissioner considered the record when he found for the appellee. That result cannot be interfered with by us.

As a basis for their attack, appellants urge that the following authorities sustain the proposition that appellee's alleged probability is no more, in fact, than a surmise or a conjecture: *Flint v. City of Eldon* (191 Iowa 845), supra; *Green v. Locomotive E. M. L. & A. Ins. Assn.*, 194 Iowa 1203; *Sparks v. Consolidated Ind. Coal Co.* (195 Iowa 334), supra; *Pentony v. Dudley* (197 Iowa 744), supra; *Slack v. Percival Co.* (198 Iowa

54), supra; *Sanderson's Case*, 224 Mass. 558 (113 N. E. 355), supra.

Some of the cases thus relied upon have to do with suits where the court is permitted to weigh or review the evidence. A consideration of those decisions will reveal marked distinctions. *Flint v. City of Eldon* held that the claimant need not prove his case "beyond all reasonable doubt." *Green v. Locomotive E. M. L. & A. Ins. Assn.* was an action in equity upon an accident insurance policy. Therein we reviewed the evidence, because the case was triable *de novo*. *Sparks v. Consolidated Ind. Coal Co.* contains the following statement:

"There is no evidence in behalf of claimant that such a result [death from a small wound] is even possible,—not to say probable. The only testimony whatever on the subject, aside from the description of the injury, is that of the physician, *who expresses the opinion that the injury in question did not produce death* [the italics are ours]."

*Pentony v. Dudley* presents a case where it was claimed, in a damage suit for negligence, that the plaintiff's intestate developed Bright's disease because of a collision caused by a buggy's coming in contact with defendant's automobile. In disposing of the subject, we said, on page 748:

"It appears from the medical testimony on both sides that Bright's disease is not the result of traumatic causes. It may be caused by infections."

*Slack v. Percival Co.* was a workmen's compensation case, and the point involved was whether an injury produced or aggravated a cancer. Apparently the employee was suffering with this malady before the injury, and the question was "whether, under the disclosed facts, this cancer was * * * so accelerated" by the injury "that it hastened the death of the employee." On page 56 we asserted:

"If it should be conceded that there is opinion evidence in the case to the effect that a cancer of the character of the one in question might have resulted from a traumatic injury, still the evidence in this case fails to show that the employee received any such an injury in the location of the cancer as might have caused its development. * * * [Page 60]. All the

medical experts agree that this malady would have killed the workman in any event."

And we concluded by saying that there was no competent evidence upon which to base a finding that the workman would have lived longer, had there been no injury. *Sanderson's Case* presented no medical testimony comparable to that submitted in the present cause, and the only evidence before the commission in explanation of the employee's death was mere impermissible conjecture.

Being unable, therefore, to interfere with the finding of the industrial commissioner, who held that Jones came to his death by a cerebral hemorrhage caused from trauma, we must and do hereby affirm the judgment of the district court.— *Affirmed.*

ALBERT, C. J., and EVANS, FAVILLE, and DE GRAFF, JJ., concur.