MRS. GRACE FEATHERSON, Appellee, v. CONTINENTAL-KELLER COMPANY et al., Appellants.

No. 44201.

MAY 3, 1938.

Kimball, Peterson, Smith & Peterson and Herbert E. Story, for appellants.

Roy W. Smith and Frank Dutton, for appellee.

SAGER, J.—We have so frequently expressed ourselves on the general principles applicable to the case before us that there is and can be little or no dispute between the parties as to such rules. The difficulty lies, as is to be expected, in the application of the facts to these rules. We have so many times spoken on this subject that it will be necessary to refer to but a very few of our later decisions, leaving the investigation of others to those who may be interested therein.

As a general proposition it will not be denied that the finding of the industrial commissioner on disputed questions of material fact is conclusive upon this and the district court.

Our views were well expressed by Powers, J., in Shepard v. Carnation Milk Co., 220 Iowa 466, appearing at pages 469, 470, 262 N. W. 110, 112, in this language:

"In the consideration of this question, the limitation upon the power of the court in compensation cases must be kept clearly in mind. The purpose of the enactment of such legislation was to avoid litigation, lessen the expense thereof, and afford an efficient and speedy tribunal to determine and award compensation. Flint v. City of Eldon, 191 Iowa 845, 183 N. W. 344. To that end the act provides that, in the absence of fraud, the findings of the industrial commissioner on the facts are conclusive. The act contemplates that all controversy over disputed questions of fact shall end with the findings of the industrial commissioner. Section 1452, Code 1931. It is not the province of the court to review the evidence and determine whether or

not it believes that the industrial commissioner reached a correct conclusion on the facts. We may well repeat here what we said in the case of Flint v. City of Eldon, supra, by way of quotation from a New York case (Rhyner v. Hueber Bldg. Co., 171 App. Div. 56, 156 N. Y. S. 903) :

" 'It was the purpose of the legislature to create a tribunal to do rough justice—speedy, summary, informal, untechnical. With this scheme of the legislature we must not interfere; for, if we trench in the slightest degree upon the prerogatives of the commission, one encroachment will breed another, until finally simplicity will give way to complexity, and informality to technicality.'

"The task of the court is to enforce this legislative scheme, not to interfere with it. If, therefore, there is evidence from which the industrial commissioner could have found as he did, the court must not interfere with such findings. Section 1453, Code 1931."

See, also, Brown v. Rath Packing Co., 219 Iowa 9, 257 N. W. 411; Jones v. Eppley Hotels Co., 208 Iowa 1281, 227 N. W. 153; Norman v. City of Chariton, 206 Iowa 790, 221 N. W. 481; Wittmer v. Dexter Mfg. Co., 204 Iowa 180, 214 N. W. 700.

With this brief attention to the rule, we turn to the record to ascertain whether or not there was a conflict in the evidence which entitles the finding of the commissioner to that conclusiveness which our cases announce. The record is quite confused and abounds in medical terms, and medical opinions which seem not always consistent. This is said without any criticism of the doctors who testified, because such is to be expected from the uncertain factors with which they had to deal.

The injured workman was admittedly working for the defendant Continental-Keller Company, which is herein referred to as if it were the sole defendant. There is, as we read the record, no competent testimony establishing the fact that he was in fact injured at the time stated in the complaint, while engaged in work within the scope of his employment. It does appear that prior to the date of the injury he was and had been employed as a shipping clerk. Up to that time he had been in good health except for a previous case of pneumonia suffered some years before, from which he appears to have fully recovered.

The claimant testified that on May 22, 1934, her husband came home exhausted and tired, and said that he had had an accident at the store; that he had fallen while loading a rug. Her testimony made his condition appear much more serious than the doctors seem to have discovered at or shortly following that time. According to her, his leg was stiff and very red from the knee to the hip; the cords were stiff and drawn, and the leg generally was very painful. She applied hot water bottles to the leg, and gave aspirin to relieve him. The next morning there was a spot on the thigh, between the knee and the hip, about the size of claimant's hand. Featherson went to work in the morning, but came home between 12 and 1 o'clock, being brought there by one Himmelsher, a truck driver for the company. On his arrival he was "all in." He was put to bed. He said he had been told by the company doctor, Treynor, to come home and keep quiet, and that claimant was to put hot applications on the leg. This was done during the day. Aspirin was given without apparent results. About 9 o'clock in the evening, or shortly thereafter, he complained, grabbed his right side, and said, "The pain shot through here like a knife." Claimant narrated other symptoms of distress not necessary to set out. He complained of "feeling bad all over," and that his lung, leg, and groin were hurting him. He had fever during the day, and was very restless through the ensuing night. The next morning, May 23, 1934, he was stiff and his leg was black and blue, but he insisted on going to work. Dr. Treynor was called that day. He made an examination and told the wife that the leg was stiff and that there was congestion in the right lung. His temperature was 102 degrees. On the recommendation of Dr. Treynor, a Dr. Hanchett was called but, he being busy, Dr. Best appeared about 4 or 5 o'clock in the afternoon, made an examination of the patient, and took his temperature. The doctor came back the next morning, found the limb in the same condition it had been, and said that pneumonia had set in the right lung. The patient was then taken to the hospital, where he remained to the date of his death, June 4, 1934.

Dr. Treynor, differing somewhat from claimant, said that there were not any very definite signs of injury. Featherson complained of pain and stiffness, but examination disclosed no definite evidence of injury. There was tenderness on pressure. After the examination the doctor made a memorandum that the work-

man had a sprain of the posterior thigh muscle of the right leg, and possibly contusion of the sciatic nerve. The patient's condition appeared to this witness to be the same on the next day. He was not then treated for pneumonia by this doctor, who said that he did not know the patient had it.

Dr. Best, in his examinations made on the 24th and 25th days of May, found a temperature of 101 or 102 degrees, shortness of breath, pain in the chest, and coughing up of a slightly rusty sputum. A small area about the size of the palm of the hand, and the type of breathing, disclosed to him early symptoms of pneumonia. The next day he found conditions about the same, but difficult breathing, with a few coarse rales which are typical of lobar pneumonia. Dr. Best's attention was centered upon the condition of the lungs more than the leg. After the patient was sent to the hospital Dr. Best continued to treat him until death. A hospital chart was kept of the patient. This chart appears in the record as exhibit No. 13. Dr. Best, who diagnosed the cause of death as lobar pneumonia, said this is an infectious process which might be caused by numerous organisms, or might be caused by traumatism. He offered no opinion as to what caused the pneumonia in the instant case. When asked if he found any connection between traumatism and pneumonia, his answer was: "It is entirely a matter of opinion. I believe it would be impossible to state that a blow on the leg definitely produced the pneumonia." He then went on at length to discuss embolism (a blocking of blood vessels by a small clot). He testified that an embolus might lodge in the lung, and, when asked what the effect would be if it did lodge there, he qualified by saying that there are two kinds of embolism,—noninfected and infected. He then further stated that lobar pneumonia could be caused only by an infected embolus. This, too, he qualified by saying that it might produce pneumonia, but not necessarily lobar pneumonia. When asked whether Featherson's condition was caused by an embolus, he said it might have been but that he observed no symptoms of embolism in the case. The cause of the injured man's death was given by this doctor as lobar pneumonia. On cross-examination, when asked, "What is your opinion as to whether or not it was an embolism that caused his death?" he answered, "I don't think it did." As to whether embolism could have been a contributing cause of death, he said it might but he could not be definite.

Dr. Smith, a physician from Lincoln, Nebraska, qualifying as an expert, gave his conclusions based upon a study of the hospital chart, exhibit No. 13. From such reading he concluded that Featherson suffered from embolism, and that lobar pneumonia was the final cause of death. On cross-examination this witness said that when he spoke of embolism he meant an infectious embolism.

Dr. MacQuiddy, a physician from Omaha, Nebraska, after qualifying, expressed the view that if an embolus from the right thigh were to lodge in the lung it might be a producing cause of lobar pneumonia.

The writer of this opinion confesses to much uncertainty as to what this witness actually intended to convey by his testimony with reference to lobar pneumonia and its causes. After an involved and indefinite discussion of the causes and effects of embolism, he went on to say that he did not know how one could tell, between the different kinds of pneumonia, whether it was produced by embolism or other causes ''unless a post mortem were held and the embolus found. I don't know how you would differentiate between the two.'' After expressing himself in a way that would seem to imply support of the claimant's theory, on cross-examination, when taken over the ground again with reference to the various types of pneumonia and pneumonic processes, he said that in his opinion Featherson did not have true lobar pneumonia, and continued: ''We are only asked for opinions. I am giving my opinion. There was no post mortem made or anything like that. It is one man's opinion against another's. Dr. Best could not swear that this thing was the embolic thing. I could not swear absolutely to that.'' Other testimony of like character appears in his cross-examination.

Dr. Kleyle, a practitioner from Omaha, called by defendant, expressed an opinion based on examination of the hospital chart. He had familiarity with cases involving lobar pneumonia. ''There is some similarity between the symptoms of embolism and lobar pneumonia,'' he said. After an extensive review of what he found on the chart, he was asked whether he had an opinion as to the cause of the man's death. He answered that it was lobar pneumonia. On further examination he testified that it was his conviction that on May 23, 1934, Featherson already had pneumonia. It was his opinion that lobar pneumonia could not follow

an embolus, which, with other features of his testimony, tends to much uncertainty as to just what his opinion was.

In addition to this, is the testimony of a Council Bluffs physician, Dr. Bellinger, that the only way to determine what this man died of would have been a post mortem.

This and much more that could be quoted from the testimony, if it did not create a conflict which was for the commissioner to decide, at least left the cause of this man's death in a state of confusion, uncertainty, and guesswork. Without setting forth the testimony, there is sufficient in the record to justify, if not compel, this finding which appears in the decision of the commissioner:

"It is apparent that in a considerable period subsequent to the crisis occurring there was no thought of connecting death with trauma as a proximate cause."

It is to be recalled that our decisions have placed upon the claimant the burden of proof to establish her claim. Stevens, J., in Susich v. Norwood-White Coal Co., 207 Iowa 1129, at p. 1132, 224 N. W. 86, 87, stated the rule in this language:

"Likewise, the rule as to the burden of proof in cases of this character is well settled by our prior decisions. It is elementary that, to entitle the claimant to compensation, the matters necessary to be shown by him must be proven by a preponderance of the evidence. Clearly, a causal connection between the injury and the possible inhalation of bad air must be based upon something more substantial that a mere possibility. On this point, see Flint v. City of Eldon, 191 Iowa 845, 183 N. W. 344; Hinrichs v. Davenport Locomotive Works, 203 Iowa 1395, 214 N. W. 585; Guthrie v. Iowa Gas & Elec. Co., 200 Iowa 150, 204 N. W. 225."

The same doctrine was announced by Kindig, J., in somewhat different language, in Jones v. Eppley Hotels Co., 208 Iowa 1281, 1283, 227 N. W. 153, 154, wherein it is said:

"To prove this essential fact, the burden is upon the claimant, appellee." [Citing a number of cases.]

See, also, Smith v. Soldiers & Sailors Mem. Hosp., 210 Iowa 691, 231 N. W. 490.

Claimant argues that the findings of fact by the industrial commissioner are not conclusive and binding upon the district court unless the facts support the order made and there is sufficient competent evidence in the record to warrant the findings. She cites Petersen v. Corno Mills Co., 216 Iowa 894, 249 N. W. 408; Tunnicliff v. Bettendorf, 204 Iowa 168, 214 N. W. 516; Rish v. Iowa Portland Cement Co., 186 Iowa 443, 170 N. W. 532. These cases do no more than to announce the rules laid down in the cases already cited. The Peterson case goes perhaps a little further in its pronouncement, in this: It holds that where there is no dispute in the facts and the commissioner erroneously applies the law, then the courts may re-examine and set aside the findings of the commissioner.

The second division of defendant's argument is that the court erred in holding that the death of the decedent was traceable directly to the injury complained of, and also was not caused by any other condition. As incidental to or connected with this assignment of error, defendant argues that the court erred in finding that any injury had occurred in the course of decedent's employment. These assignments of error are of necessity largely argumentative and are predicated upon deductions drawn from the record. They are disposed of by what has been said with reference to the powers of the commissioner on disputed facts.

Defendant likewise argues that claimant's case with reference to the injury having happened in the course of the employment is based entirely upon hearsay and incompetent evidence, with no direct testimony whatsoever to sustain it. We agree with this contention, but it is not necessary to analyze in detail the record in this regard. lt is sufficient to say that no one appeared to testify that he witnessed the accident, and the only basis for the claim that it happened in the service of the defendant is testimony of claimant and others as to what Featherson said.

Claimant, among other contentions which she urges in support of the ruling of the trial court, says that the proof required to establish the relation of cause and effect between an injury and the subsequent ailment must be such as to take the case out of the realm of conjecture, but, if the evidence furnishes a reasonable basis for inference that the injury was the cause of what followed, this is sufficient.

Defendant concedes that claimant's case may not be based wholly in the realm of speculation, conjecture, and surmise.

From a reading and re-reading of the abstract in this case, we find that claimant's cause rests entirely upon the unsubstantial foundation which both parties agree is not sufficient to sustain the claim. In this situation defendant has the best of the argument for the reason already pointed out that the burden was on the claimant and not on the defendant.

We hold that the commissioner was right on this point, and that the trial court was in error in holding otherwise.

Other questions are argued, but they inhere in what has gone before and are decided thereby so far as the facts of this case are concerned.

We have not overlooked the statement of claimant that the decision of the commissioner on its face evidences a degree of bias which made it impossible for him to properly weigh the evidence, but we do not deem it necessary nor profitable to enter that field.

We have found from a most careful scrutiny of the record that there was a fair conflict in the evidence on which the decision of the commissioner was final; that the causes of Featherson's death were uncertain and speculative; and that the claimant has failed to sustain the burden which the law imposes upon her.

It follows that the trial court was in error, and its ruling is reversed.—Reversed.

ANDERSON, DONEGAN, HAMILTON, KINTZINGER, RICHARDS, and MILLER, JJ., concur.