LEATHA HANSEN et al., appellees, v. STATE OF IOWA, appellant.

No. 49431.

(Reported in 91 N.W.2d 555)

1148

JULY 28, 1958.

Norman A. Erbe, Attorney General, and James H. Gritton, Assistant Attorney General, of Des Moines, for appellant.

Henry W. Wormley, of Des Moines, and Ben C. Birdsall, of Clarion, for appellees.

PETERSON, J.—Jack Axel Hansen was deputy sheriff of Wright County from June 20, 1950, to June 3, 1953, when he lost his life in an automobile wreck. He was the only deputy. On June 2 the sheriff made the suggestion to Deputy Hansen that he take the next morning off to go fishing, and the sheriff would do the same some morning later in the week. He instructed Hansen that he must be back by noon because he was leaving at twelve o'clock for a peace officers' meeting at Iowa Falls. Mrs. Hansen testified her husband planned to go fishing at Clear Lake, Iowa. He loaded his fishing tackle in the car and left home about 8 a.m. on June 3.

He did not return at noon and did not report to the sheriff's office either in person or by telephone at any time during the afternoon.

About 7 p.m., he was driving his car south at a high and excessive speed on highway 69. This was on the direct route

from Clear Lake to Clarion. Two miles south of the north line of Wright County he approached an "S" curve in the road. From the marks on the pavement it appeared his right wheels ran off the west side of the pavement in trying to navigate the curve. In pulling his car back on the pavement, he lost control of the car and shot across to the east side, and off the pavement. Approximately 251 feet from where he drove off the pavement he hit a telephone pole. His car was completely wrecked and Deputy Hansen was killed.

Leatha Hansen, his wife, for herself and on behalf of their only child, John Lee Hansen, a minor, filed claim with the Industrial Commissioner against State of Iowa in accordance with provisions of section 85.62, 1954 Iowa Code, for payment of funeral expenses in the amount of $300, and for 300 weeks allowance at $28 per week.

Hearing was held before the Deputy Commissioner. He denied the claim on the basis that Deputy Hansen was not killed while performing duties arising out of and in the course of his employment as a law-enforcing officer. On appeal the Commissioner affirmed the decision. Upon appeal to the District Court the decision of the Commissioner and his Deputy was reversed. State of Iowa has appealed.

I. A brief legislative and judicial history as to workmen's compensation liability of the State of Iowa concerning injury or death of peace officers is advisable. The original Workmen's Compensation Act was enacted by the Thirty-fifth General Assembly in 1913. It contained no law-enforcement officer provision. The Fortieth General Assembly (chapter 17) in 1923 enacted the first step in this direction as follows: "Any policeman (except those pensioned under the policemen's pension fund created by law), any sheriff, marshal, constable and any and all of their deputies, and any and all other such legally appointed or elected law-enforcing officers, who shall, while in line of duty or from causes arising out of or sustained while in the course of their official employment, *meaning while in the act of making or attempting to make an arrest or giving pursuit, or while performing such official duties where there is peril or hazard peculiar to the work of their office*, be killed outright, or

become temporarily or permanently physically disabled or if said disability result in death, shall be entitled to compensation, the same to be paid out of the general funds of the state for all said injuries or disability." (Emphasis ours.)

In 1935 this court decided the case of Roberts v. City of Colfax, 219 Iowa 1136, 260 N.W. 57. Mr. Roberts lost one eye from the accidental discharge of his revolver when it fell from his pocket while he was engaged in cleaning the floor of the city jail. We held there was no liability because there was no arrest, peril nor hazard involved in the duty he was performing.

As a result of this decision the Fifty-first General Assembly (chapter 80, section 1) amended the original Act, as above quoted, by repealing the italicized words.

■ The question of the intent of the legislature as to liability of the State of Iowa concerning injury or death of law-enforcing officers was not again raised until 1957 when the consolidated cases of City of Emmetsburg v. Gunn and City of Estherville v. Hackett, 249 Iowa 297, 86 N.W.2d 829, came before this court. We held that in view of the action of the Fifty-first General Assembly in striking the above quoted words as to arrest, pursuit, peril and hazard it was the intention of the legislature *that any injury or death* of a law-enforcing officer *arising out of and in the course of the officer's employment* created workmen's compensation liability on the part of the State.

Although there is no relationship of employer and employee between the State and the peace officer, the legislature by special statutory provision has established liability on the part of the State as to injury or death in line of duty. Chapters 85 and 86 and the pronouncements of this court as to workmen's compensation in private industry and municipalities apply with equal force in connection with liability of the State.

■ II. The vital question before us is: is there substantial evidence that death did not "arise out of" and "in course of" decedent's employment as a peace officer? Or, in other words, was he doing what he "might reasonably do" and was he where he "might reasonably be" as a law-enforcing officer when fatally injured? We have analyzed these conditions in

several cases. Griffith v. Cole Brothers, 183 Iowa 415, 165 N.W. 577, L. R. A. 1918F 923; Christensen v. Hauff Bros., 193 Iowa 1084, 188 N.W. 851; Enfield v. Certain-Teed Products Co., 211 Iowa 1004, 233 N.W. 141; Pace v. Appanoose County, 184 Iowa 498, 505, 168 N.W. 916; Walker v. Speeder Machinery Corp., 213 Iowa 1134, 240 N.W. 725; Yates v. Humphrey, 218 Iowa 792, 255 N.W. 639; Crowe v. DeSoto Consolidated Sch. Dist., 246 Iowa 402, 405, 68 N.W.2d 63, 65.

In Crowe v. DeSoto, etc., supra, we said: "Under these conditions, was the injury one that arose out of and in the course of the plaintiff's employment? It is well settled that the words 'arising out of' and the words 'in the course of' are used conjunctively, and so both conditions must exist to bring the case within the statute. * * * It is also well settled that the words 'out of' point to the cause or source of the accident, and 'in the course of' relate to the time and place and circumstances of the injury."

In Griffith v. Cole Brothers, supra, we stated at page 425 of 183 Iowa: "The test seems to be whether deceased * * * was doing what 'a man so employed may reasonably do within a time during which he is employed, and at a place where he may reasonably be during that time'."

In the case at bar Deputy Hansen was not doing what he should reasonably do, nor was he where he should reasonably be, when the tragedy happened. In the absence of the sheriff, and in accordance with the sheriff's instructions, he should have been in the office or on call in Wright County during the afternoon of June 3. Normally he should be home at 7 p.m., subject to any calls for peace-officer duty.

III. The burden rests on claimants to prove by a preponderance of the evidence that they are entitled to recover under the provisions of section 85.62, 1954 Iowa Code. Sparks v. Consolidated Indiana Coal Co., 195 Iowa 334, 190 N.W. 593; Bushing v. Iowa Railway & Light Co., 208 Iowa 1010, 226 N.W. 719; Otis v. Parrott, 233 Iowa 1039, 8 N.W.2d 708; Crowe v. DeSoto Consolidated School District and City of Emmetsburg v. Gunn, both supra.

In Bushing v. Iowa Railway & Light Co., supra, we said

(page 1018 of 208 Iowa): "Under the Iowa act, to justify an award, three things must be shown by the evidence, direct or circumstantial, including the reasonable presumptions and inferences drawn therefrom. These are (1) that the employee suffered an injury; (2) that the injury was sustained in the course of the employment; and (3) that the injury arose out of the employment. This court does not hold that, when an employee dies at his post of duty, a presumption arises that the death was one arising out of and in the course of the employment. This is a matter of proof, *and the burden is on the claimant.*" (Emphasis ours.)

Claimants contend they have carried the burden and base their case on two grounds: 1. When Deputy Hansen entered Wright County on his return from Clear Lake he immediately and automatically came on duty as a law-enforcing officer. 2. His high speed, and the flashing of the red rear light on his car after the wreck, was evidence that he was in pursuit of a law violator and, therefore, in performance of his duty as a law-enforcing officer.

As is true in so many workmen's compensation cases we find mixed questions of fact and law involved. We commented on this situation (page 406 of 246 Iowa) in Crowe v. DeSoto Consolidated School District, supra, as follows: "As so often occurs in matters of this kind, we have a general mixture of questions of fact and law. It is somewhat difficult to distinguish them so as to state which findings of the commissioner are binding upon the court and which are for the court's determination as questions of law. The rule is clear but its application difficult because as here several inquiries involve both questions of law and fact. Here we must pass anew on the law question and determine whether there is substantial support for the commissioner's finding of fact."

IV. The first contention of claimants that Hansen immediately came on duty when he crossed into Wright County is deduced from the theory that a peace officer is on call seven days a week, twenty-four hours a day. As to whether or not this theory is effective is a question of law. We held in City of Emmetsburg v. Gunn, supra, that the legislature clearly in-

tended to provide that the State of Iowa is liable if a law-enforcing officer is injured or killed while in the performance of his official duties, hazardous or not. We now hold this is the extreme extent to which we can liberalize the intent of the legislature as provided in section 85.62. We cannot approve the further step urged by appellees herein that the State is liable if a sheriff is injured or killed at any time during the twenty-four hours of the day, simply because he is a law-enforcing officer and within his jurisdiction, and irrespective of the cause or place of his injury.

We recognize the fact that the law-enforcing officer situation is different from that of a private employee, or even of other municipal employees, who work regularly for a definite or specific number of hours each day. A peace officer is on call for duty at any time and it might be outside of his regular daily hours of service. If he is called for law-enforcement work outside of regular office hours and is injured or killed while on such special duty he is covered by the provisions of section 85.62. At all other hours, while not on regular duty or "special called" duty, the State of Iowa is not liable for injuries or tragedies which might occur. Sparks v. Consolidated Indiana Coal Co. and Bushing v. Iowa Railway & Light Co., both supra; Jones v. Eppley Hotels Co., 208 Iowa 1281, 227 N.W. 153; Enfield v. Certain-Teed Products Co., Walker v. Speeder Machinery Corp. and Crowe v. DeSoto Consolidated Sch. Dist., all supra.

V. The second contention of claimants that the evidence shows Deputy Hansen was actually performing law-enforcement duties at the time of his death is a question of fact and is wholly within the province of the Commissioner.

Following is a brief statement of the only eyewitness evidence in the record as to what happened when Deputy Hansen was killed.

He was proceeding south on Highway 69 at approximately 7 p.m. He had crossed the county line and driven into Wright County when the accident happened. Highway patrolman Sievers arrived at the scene very shortly after the accident, and before the car had been moved. From his experience with wrecks he testified: "From the physical damages and from the conditions I observed at Jack's accident, I would guess that Jack

could very well have had that car wide open. By 'wide open' I mean 90 miles an hour or better."

Highway patrolman Sparby came with him and testified: "At that point the highway is a slow 'S' curve. This car was in the 'S' curve when it first went off the highway. * * * Where he left the pavement it was near the end of the curve. * * * I would say it was in the curve where his wheels first left. * * * The accident was due to the defect, the drop-off between the shoulder and the pavement, and the fact the car was traveling at a high rate of speed. * * * I would say 70 or over. * * * The weather conditions at the scene of the accident when I investigated it were clear; it was daylight; the pavement was dry."

Between the towns of Goodell and Belmond the Rock Island railroad track runs parallel with highway 69 for a distance of about one and one-half miles. The distance between the track and the highway is between 100 and 125 feet. At about 7 p.m., a Rock Island freight train was proceeding south on the railroad. Garold Lee was the engineer. He testified:

"At a point about one and a half miles north of Belmond I observed a car traveling south on highway 69. * * * The car passed our train and proceeded on down the highway and from a distance we noticed a cloud of dust. When we approached closer we could see the car was wrapped around the post, and from the looks of the car it looked like whoever was in it would be beyond our help. * * *

"I did not observe any other car traveling south on highway 69 prior to the time that I saw this car which was wrecked. * * * The only thing we could notice different at the time this vehicle which was wrecked passed my train, by which to identify it, or that I noticed different than any other car, was that on the rear ledge behind the rear seat there was a stop sign which would lead me to believe it was an officer of the law. * * * It was on the back seat ledge of the car. We noticed that as the car got by us a little ways. When this car passed my train this light was not blinking. I observed * * * that the light on the back seat ledge was blinking following the accident. * * * I am positive that as of the time the car passed my train while it was traveling south that light was not blinking. * * *

"My recollection at that time was he was going at a very high rate of speed. When I employ the terms 'at a very high rate of speed' I mean just what I said. It is hard to pin it down to actual miles, but I would say that he was doing between 70 and 75. * * * 'We had proceeded a distance and there seemed to be an explosion like someone was blasting at a gravel pit down that way, but as we came close we could see a car wrapped about a light pole.'

"No, there wasn't a time I couldn't see this automobile. * * * It seemed like the car dropped off the paving on the right side and in attempting to get back on the pavement turned too sharp and the car got out of control and left the shoulder on the left side and struck the light pole. * * *

"For the purpose of the record and so there is no misunderstanding, I don't know anything about what Mr. Hansen was doing save and except I say I saw an automobile going down the road and later found him dead in the car after it was crashed; that is all I know about it. * * *

" 'I was an engineer on No. 436 between Goodell and Belmond. About a half mile north of the accident a car passed us going south at a very high rate of speed. The fireman and myself noticed its unusual high rate of speed because it seemed to be in no pursuit of anyone. The rear stop light on the back ledge of the car was not flashing.' "

The fireman, Paul M. Derrickson, testified: "We could see the highway for a space of about a mile and a half or two miles from the train. I could see the highway and I did not see any other car. * * * Following the wreck, that light was blinking. I am positively sure that at the time that car passed my train it was not blinking. I am certain that following the time my train started to go south from Belmond at the point where the railroad track runs parallel with highway 69 down to the point to a mile and a half north of Belmond where I observed this car which was wrecked, I saw no other car which was traveling south on highway 69."

The only other evidence offered in connection with the inference that Deputy Hansen was engaged in actual performance of his duties as a law-enforcing officer at the time of the accident

is that Mrs. Hansen, Sheriff Blecker and the two highway patrolmen testified that normally decedent drove his car at the rate of 55 to 60 miles per hour; that ordinarily the only time he exceeded this speed limit was when he was in pursuit of law violators.

The appellees raise the question as to whether or not the record showed that Deputy Hansen actually went fishing on June 3. There was sufficient evidence to justify the Commissioner in finding that he had gone on a fishing trip.

Sheriff Blecker testified: "I made the suggestion to him [Hansen] or statement, for he to take that morning off to go fishing as I was going to try to do the same thing some morning during the week. I mean the morning of June 3, 1953."

Mrs. Hansen, wife of Deputy Hansen, testified: "* * * they were doing a great deal of work at night, so they were going to take turns going fishing. Jack planned to go to Clear Lake, Iowa, in Cerro Gordo County. * * * He left the house that morning at approximately 8 o'clock or perhaps a little before. * * * Jack left the house alone. It was his intention so far as I know to go fishing * * *. He took his fishing tackle with him, I saw that. The tackle was found in the car after the accident. * * * He told me the sheriff was going to a meeting in the afternoon and he had to be back, and he was to be back at noon to take over."

The contention is immaterial because the record shows without question that he was not on duty at any time during the day of June 3. Since he was not on duty, whether he was fishing or someplace else would not be important as to the merits of the case.

Lillie Culbertson was the secretary in the sheriff's office. She testified: "Jack Hansen didn't come into the sheriff's office on the date of June 3 during the hours I was there. I was there during the hours between eight in the morning and about 4:30 in the afternoon except at the noon hour. I don't remember receiving any telephone call from him. I don't remember that Jack Hansen contacted me in any way on June 3 during the hours of eight in the morning until 4:30 in the afternoon."

VI. Section 86.29, 1958 Iowa Code, provides: "* * * In

the absence of fraud the findings of fact made by the industrial commissioner within his powers shall be conclusive." No fraud of any nature is alleged. We have considered this section in many cases among which are the following: Boswell v. Kearns Garden Chapel Funeral Home, 227 Iowa 344, 288 N.W. 402; Nellis v. Quealy, 237 Iowa 507, 21 N.W.2d 584; Taylor v. Horning, 240 Iowa 888, 38 N.W.2d 105; Burt v. John Deere Waterloo Tractor Works, 247 Iowa 691, 73 N.W.2d 732; Enfield v. Certain-Teed Products Co. and Bushing v. Iowa Railway & Light Co., both supra.

If the facts in the case are such that in a law action the trial court should submit the question to the jury, then the fact question in the case is for the Commissioner and his findings of fact are as conclusive on this court as would be the decision of the jury. Lindeken v. Lowden, 229 Iowa 645, 295 N.W. 112; Reddick v. Grand Union Tea Co., 230 Iowa 108, 296 N.W. 800; Reynolds v. George & Hoyt, 230 Iowa 1267, 1271, 300 N.W. 530, 532.

In Reynolds v. George & Hoyt, supra, we said: "If the evidence presents a question which should have been submitted to a jury, if the trial were before a jury, then the court is bound by the findings of the commissioner."

We quote from Taylor v. Horning, supra (page 890 of 240 Iowa): "We have frequently called attention to the functions of the industrial commissioner and the court in cases of this character. Where the facts are in dispute or reasonable minds may differ on the inferences fairly to be drawn therefrom the findings of the commissioner, in the absence of fraud, are conclusive. This is true even though the court might have arrived at a different conclusion from the evidence. If under the testimony there is a question which should have been presented to a jury, if trial were before a jury, then the court is bound by the commissioner's finding on such question."

On the basis of the facts as outlined a trial court would have submitted the case to a jury. In view of this situation this court must accept the findings of fact of the commissioner.

Claimants contend, and the trial court held, that the case is controlled by paragraphs 3 and 4 of section 86.30, 1958 Code

of Iowa, which provide: "Any order or decision of the industrial commissioner may be modified, reversed, or set aside on one or more of the following grounds and no other: * * * 3. If the facts found by the commissioner do not support the order or decree. 4. If there is not sufficient competent evidence in the record to warrant the making of the order or decision."

Any conflict in the evidence as to inference to be drawn from the flickering of red rear light on car, and as to normal speed of decedent as compared with speed when killed, as opposed to the definite and positive eyewitness testimony of the railroad engineer and fireman, was for the Commissioner to decide.

We hold there was sufficient evidence to sustain the Commissioner, so that the case does not come under paragraphs 3 and 4 of section 86.30, as was held by the trial court.

The decision of the trial court is reversed.—Reversed.

All JUSTICES concur.