IDA R. LINDEKEN, substituted claimant for T. E. LINDEKEN, deceased, Appellee, v. FRANK O. LOWDEN et al., Appellants.

No. 45427.

DECEMBER 10, 1940.

REHEARING DENIED MARCH 14, 1941.

Carl F. Jordan, for appellee.

Deacon, Sargent & Spangler, J. G. Gamble, and A. B. Howland, for appellants.

BLISS, J.—Theodore E. Lindeken, the husband of the claimant, was a boilermaker who had been in the employ of the de-

fendant company for about 12 years. At the time of his injury, he lacked a few months of being 62 years old. He was about 5 feet 6 inches tall and weighed approximately 165 pounds. He had never lost any time from his work because of physical disability. His work was rather strenuous and required the use of considerable physical effort. He was in apparent good health on the day of his injury and at all times prior thereto. About five months before that day, he had been physically examined by a doctor for life insurance and was accepted. About midafternoon of October 16, 1937, he was replacing some stay bolts in the firebox of a locomotive, when, because of being thrown off balance by the operation of the implement he was using, he fell and struck his left knee on the grates and received a comminuted fracture of the knee cap with some tearing of the quadriceps tendon fastening the muscles of the front upper leg to the knee cap. He was at once taken to St. Lukes Hospital in Cedar Rapids, where he was placed under the care of Dr. Ruml, the local surgeon of the railroad company. X-rays were taken, the knee was bandaged with a figure eight bandage, and a posterior splint was put on. No cast was ever placed on the leg. He was then placed on a fracture bed and a weight extension was applied to the foot. From day to day until the late afternoon of October 30th, nothing appeared out of the ordinary in his condition. His recovery appeared to be progressing normally. His blood pressure, temperature, respiration, and pulse appeared to be approximately normal for one of his age lying at rest. His pulse, however, varied from 50, 54, 60, 62, 64, 68, 72 to 80. Occasionally when the bandage was changed, he complained some of its being tight, but this discomfort would pass away. The bandage was changed at 10 a. m. of October 30th, and for a time he spoke of a "thumping" feeling in his leg, but he did not ask that it be changed, and this sensation apparently disappeared. When callers came and at meal time, he was raised to a semi-sitting position by the mechanical operation of the bed. At 4:57 o'clock in the afternoon of October 30th, while he was eating from a tray, he was observed by another patient in the room to drop his fork, his head fall forward, and to not respond when spoken to. Hospital attendants and doctors were called. His face became cyanotic and he gasped for breath. His pulse which was at 80 at 3 o'clock was

100 at about 5 o'clock, although fairly regular. He complained repeatedly of severe pain about 10 or 12 inches below his chin. Heart stimulants were given and oxygen administered through a nasal catheter. At 5:40 o'clock his pulse was 128, and thereafter it was a flutter and impossible to count. He was conscious and talked and recognized members of his family until shortly before his death at 6:05 o'clock that afternoon. His body was taken to the mortuary and the embalming process was begun. The blood was forcibly withdrawn from the circulatory system through the veins by a suction pump, and the embalming fluid was forcibly injected into the circulatory system through the arteries. An autopsy having been requested by Dr. Ruml, and consented to by the family, the work of embalming was stopped and no embalming fluid was injected into the abdominal cavities. The next morning at 9 a. m., a necropsy of the organs of the chest and abdomen was performed by Dr. Mulsow, a competent pathologist. Dr. Ruml, two internes and a doctor friend of the family were present. No examination was made of the brain. The report of the autopsy, and Dr. Mulsow's testimony shows that no tumor masses or emboli (blood clots) were found in the larger vessels; the heart was large and weighed 410 grams, or about one-third heavier than for a man of his size; there was moderate fatty arteriosclerosis of the orifice of the left coronary artery, with a marked sclerosis of the descending branch of that artery. This branch was very tortuous and the thickening of the walls had reduced the opening or channel of the branch to about one fourth its normal caliber or size. There was moderate atherosclerosis of the aorta, and also some sclerosis in the right coronary artery of the heart and its branches, but much less than in the left descending branch on the left side. The organs of the abdomen showed rather negative conditions. The injured knee was examined, and while it was slightly swollen, no thrombosed vessels were found, nor any evidence of a previous thrombosed condition. The coronary arteries, both right and left, branch out of the aorta, and with their branches and capillaries nourish the muscles and tissues of the heart with the purified blood. The left coronary arterial system serves not only the left side of the heart, but also extends into the right side, and the right coronary arterial system serves the right side of the heart, and also gives greater

aid to the left coronary system than it receives from the latter. If either system becomes so damaged by sclerosis that it cannot properly serve the heart muscles on its side, nature extends the arterial system from the other side in order to supply with blood the parts that have been deprived of their supply. In fact, nature may clean out the clogged channels or open new channels in order to increase the blood supply to any part of the heart muscle receiving a deficient supply. Such process is referred to, in the record, as "collateral circulation." It is the testimony of Dr. Glomset, a witness for appellants, that an ordinary lead pencil is a very good average size for an adult coronary artery, and that sometimes the openings get as small as the lead in a lead pencil, and smaller.

I. The legal questions involved in this case are neither many nor complicated. It is admitted by the appellants, whom we will refer to as the company, that the initial knee injury arose out of and in the course of the regular employment of the deceased with the company. It is, of course, conceded by the claimant that the sclerotic condition of the left coronary arterial system was not caused by the knee injury. That condition was a progressive one which had its inception, according to the testimony of different doctors, from two to 20 years before. It is conceded by both sides that the direct cause of death was the failure of the heart muscle to function because of a deficient supply of arterial blood. The vital issue in the case, and the one which the claimant must establish by a preponderance of the evidence, is whether the knee injury and its subsequent treatment so contributed to said cause by aggravating and accelerating the heart disability of the deceased as to hasten and bring about his death at a time earlier than it would have occurred without such injury and treatment. The deputy commissioner in a reopening hearing on the memorandum agreement, which the commissioner treated as an arbitration hearing, found that the claimant had sustained this burden. On a review hearing de novo, the commissioner affirmed the findings and decision of his deputy. On appeal, the district court affirmed the decision of the commissioner. The question for our determination is whether there is sufficient competent evidence of the facts found by the commis-

sioner to support and warrant the making of his order and decision, and the affirmance thereof by the order and judgment of the district court.

It is the contention of the appellee not only that the knee injury was, as Dr. Ruml wrote to the chief surgeon of the railroad company, on December 2, 1937, a severe one which may have indirectly lowered Lindeken's resistance, but what is much more important, the removal of Lindeken from the activity of hard, vigorous work, and placing him in a condition of almost absolute rest and inactivity, with his left leg immobilized, decreased the action of his heart and caused a definite and decided retardation of the flow of his blood stream, and that because of the greatly reduced channel and the tortuous course of the descending branch of the left coronary artery, a condition was brought about in said artery which was conducive to the formation of a thrombus, or to the lodgment of an embolus therein. A thrombus, as appears from the testimony of different doctors, is a blood clot formed in a blood vessel while the patient is living. It forms in one spot and ordinarily remains there. An embolus is a blood clot, globule of fat, bubble of air, or some foreign substance which gets into the blood stream and flows along until it lodges at some point too small for its passage. The terms thrombus and thrombosis appear to be used interchangeably. The same is true of embolus and embolism. We find little, if any, dispute in the record that putting a person at complete rest in a bed will slow up the pulse rate and with it the rate of flow and force of the blood stream. Directly in point on this is the testimony of Dr. John Parke, for the claimant, on cross-examination:

"Q. It is your opinion * * * that if a man has never had an attack, but has arteries in the condition disclosed by the autopsy report, * * * that it is a very dangerous thing to put him to bed, and is liable to precipitate an attack? A. The answer is Yes, for this reason—Any man with marked narrowed coronary arteries has a diminished blood flow through those, and anything which lowers the amount of blood flowing through those arteries would tend to precipitate an attack. In other words, coronary arteries, narrowed as these were, 50 percent I wouldn't say would be too much to say, suppose that with bed rest his pulse rate went down four to six beats, eight or nine percent of the

blood ordinarily flowing during active exercise is not flowing, that may be enough to precipitate an attack. That, I think is the whole point in the argument.''

Dr. B. F. Wolverton, for the claimant, after testifying that the enlarged heart of the deceased indicated high blood pressure at some time, but that the only reading on the chart indicated a normal blood pressure, said:

''* * * with narrowed sclerotic arteries and a lower blood pressure, the rate of flow through the arteries is reduced, then the enforced inactivity of the leg, placed on a pillow and bandaged in such a way that the patient couldn't even move extensively in bed over a two weeks' period, would further cause the circulatory rate to slow down, and would definitely favor thrombosis, predispose to thrombosis.''

In reply to the question, immediately following the above stated answer, ''Was that the sequence of events which in your opinion caused his death?'', he answered ''Yes.'' He further testified ''The volume of flow through the vessel depends upon the caliber of the vessel, and the pressure at which the blood is driven through it. * * * I would say the most common cause of death (in coronary sclerosis) is thrombosis of the artery. * * * It is felt that very often there is a projection of atheroma into the lumen (opening) of the vessel in such a way that, as the blood passes, an eddy is formed behind it, which slows the rate of flow of blood past that point; then there is opportunity for clotting of the blood in this little backwash, behind the projecting angle.''

On further cross-examination, this witness made the point very definite:

''Q. In other words, the suggestion you made as to the thrombosis or embolism is merely an explanation, on your part, as to what *might* have happened in this man to have caused his death, isn't that true? A. That is what I think *did happen.*''

Dr. Edward H. Files, for claimant, in answer to a hypothetical question based upon matters, applicable to Lindeken, with respect to his enforced rest, answered: ''I would say that enforced bed rest brought on—made necessary by the injury would certainly favor vascular stasis, and would thereby predis-

pose toward thrombosis in the vascular system.'' He further testified that the medical profession generally recognizes that enforced bed rest slows the rate of the heart, retards the volume flow of blood, and would affect the heart muscle which that volume flow nourishes. In answer to the inquiry whether in his opinion, the accident resulting in enforced bed rest probably hastened the death of Lindeken by reason thereof, he answered : ''I believe that the accident and its attendant enforced bed rest would produce a retardation of the volume flow of blood in the body, and would predispose to a vascular accident, such as the manner of this man's last hour or two of life would, clinically, be typical of.'' By vascular stasis the doctor said he referred to a change in the volume flow of blood, that is, a slower and smaller rate and volume, which he said was certainly one factor which predisposes to coronary attack or occlusion.

Dr. R. K. Keech, a witness for claimant, in answer to an inquiry as to whether the accident and enforced rest would hasten the death of the person referred to in the hypothetical question, said : ''My opinion is that the injury and going to bed of this patient incident to this injury, must be considered a contributory factor in his death, and would hasten his death.'' He further testified : ''I would say that the accident and the putting of this man in bed, and the general slowing up of his circulation would predispose to the formation of a thrombosis, or stopping of the flow of blood through the heart.''

Six or seven doctors testified for the appellants. While conceding that bed rest would slow up the blood flow, they maintained that such rest would not predispose to thrombosis, nor endanger the patient, nor hasten him to his death. On the contrary, they contended that when it became known that the person was afflicted with arteriosclerosis because of an angina or coronary attack, the standard practice of the profession required that the patient be put and kept in bed at complete rest. All of the doctors for the appellee agreed with this contention, that is, if the patient was *already* suffering from an acute coronary *attack* or *onset*, and was having difficulty breathing, and suffering pain in the heart or heart region, he should, of course, be put to bed, to try to ease the suffering and perhaps avoid a lesion of a heart vessel, even at the risk of the formation of a blood clot or throm-

bus by slowing up the blood stream. It was a choice of the lesser of two evils, since he was already suffering from an attack brought on by a thrombus or stoppage of some kind. By rest in bed, nature would be given an opportunity to repair the damage caused by the occlusion, by putting into effect the collateral circulation mentioned above. But all of the doctors, on both sides, quite fully agreed that they would not ordinarily put a person to bed simply because he had coronary artery sclerosis, if he was suffering from no attack. Their advice to him would be to take it very easy, to not overeat, or worry, or get excited, to cut out alcohols, smoking, and to get plenty of rest and sleep, but to be up and around. The record shows that over 50 percent of all persons over 50 years old have arteriosclerosis or hardening of the arteries. Keeping them all in bed indefinitely might not be practicable. If Mr. Lindeken, with a history of never having lost a day in 12 years of work, had gone to any of the doctor witnesses, on the morning of October 16, 1937, and the doctor had learned that he had marked sclerosis in the descending branch of the left coronary artery, it isn't likely, in the light of the testimony of any of them, that he would have been ordered to bed. He would have been told to ease up. Lindeken was forced to the hospital bed because of the knee injury, and not because he had coronary sclerosis.

The doctors for the appellants are much in doubt as to just what were the cause and the mechanics of the attack which brought about Mr. Lindeken's death. Dr. Ruml was at the autopsy. He said they found no clots in the heart arteries. On direct examination, his answer as to the cause of death was very general. He said: ''My opinion was that death was produced by the condition of the heart.'' On cross-examination, he said: ''My opinion is that there was a narrowing of the coronary artery, *and a spasm of the artery,* which interfered with the blood supply to the heart. The probabilities are, that, having had his supper put a little extra work on the heart and brought about that spasm. That would be my interpretation of what occurred at the attack.'' Here was a man, a boilermaker, who two weeks previous was engaged in the heavy labor of his trade, overcome while eating his meal in bed. The commissioner apparently doubted such interpretation. Arteriosclerosis is a slowly pro-

gressive ailment. A defense doctor said in this case it had progressed for five, ten, fifteen or twenty years. There was still a 25 percent opening in the artery after death, and yet Dr. Ruml opines that after two weeks in bed this artery spasmodically closed this 25 percent channel and brought about death. There is no tangible evidence in this record that there was ever such a spasm. The autopsy disclosed that the 25 percent opening was still there and there were no observable indicia that it had ever been closed by a spasm. Counsel for appellants argue strenuously that the opinions of appellee's experts are mere guesses, conjectures and surmises. We do not agree with these designations, but Dr. Ruml's opinion appears to be based wholly on conjecture.

Dr. Chauncey C. Maher, Chicago heart specialist and professor of medicine in the Northwestern University Medical School, testifying for appellants, does not subscribe to the artery spasm theory. He said: "As to what change took place in that artery when the collapse came, when the patient was eating his dinner, our belief is that there is not necessarily a change in the artery itself. There is the thought that there is a spasm of the arteries —that they change or narrow their caliber. But the more likely thing that happens, rather than an actual change or spasm in the arteries, is a change in the way the heart beats. That is the damaging thing, and the thing that causes death." The beat becomes irregular, unrhythmical, and "the circulation utterly awry," in his opinion. But he does not say what organic change or other happening precipitates this sudden awryness. The patient's chart shows that several minutes after the attack, his pulse was fast but "fairly regular." He agrees in part with appellee's doctors, in saying that long bed rest reduces the per time volume of the blood through the vessels, and that "the patient's heart in this case didn't pump the blood through at the usual speed and level." He further states "there has been some question in the minds of the heart men interested in this question, whether actual spasm occurs in the coronary vessels." And then rather irrefutably, he states "those vessels are hard like wood; they are stony, so that it is impossible for that particular place to cause a spasm. The vessels beyond that may have a spasm in them, beyond that

site, depending upon the extent of their calcification, but the little ones down at the end don't usually have much change in them. * * * I think there *may have been,* in this case, a spasm of the artery, beyond the constricted area, described in the autopsy; beyond the narrowed area in the left descending branch.'' This is outside the record, and pure surmise. So far as the autopsy report shows, the left descending branch was narrowed throughout.

Dr. H. R. Hess, for appellants, testified: ''It would be my judgment that the cause of the death of the person described was coronary heart disease.'' This answer does not help much. . No one disputes that he died from heart disease. On cross-examination by the deputy commissioner, he became slightly more specific. He said: ''I believe it was a spasm of the coronary vessel, *but I can't locate the vessel. I would think* it was one of the branches of the larger coronaries. * * * I don't believe there could be a spasm of that part of a coronary artery which is badly sclerosed. It must have been some of the branches of that particular artery.'' The only branch with marked sclerosis was the ''descending branch'' referred to in the autopsy report. He guesses again with the remark that ''it is very possible that this spasm extends to the heart muscles too. * * * That would be a fibrillation of the ventricle.'' On examination by the deputy, the doctor confesses that, *''there is no definite way of proving whether spasms occur,* under the circumstances which I have been discussing. After death, of course, the portion of the artery subject to the spasm relaxes.''

Dr. J. Stewart McQuiston, for the appellants, testified to a conceded fact that ''the man died principally, and primarily, from coronary sclerosis.'' He thought that the spasm was ''of the smaller vessels, which are quite small, *and still able to dilate and contract.''* In other words, that the entire trouble lay, not with the sclerosed vessels but with the healthy, unimpaired capillaries. He also suggested ventricular fibrillation. On examination by the deputy, the doctor elucidates further: ''I don't believe that we know just what causes the spasm, to which I attributed the death in this case. *We do know that something happened suddenly.* These cases occur under all sorts of circumstances. They don't seem to follow any particular rule, *and consequently,*

*we can't form any opinion.* There must have been some reason that the patient became afflicted at the time, and in the manner, he did. I don't believe there would be anything in connection with the last two weeks of his life that would cause any marked increase, or marked change, in the condition of arteriosclerosis in the coronary vessels." With further frankness, he states: *"We have no definite way of knowing that there was a spasm of the blood vessels of the heart. It is an assumption."*

Dr. David E. Beardsley, a local surgeon at Cedar Rapids for the appellants, testified that his theory was that there was a spasm of the vessels beyond the obstruction "that threw the rhythm of his heart out of line and caused it to beat irregularly. *Perhaps,* the part of the heart, where he had the spasm didn't beat at all. * * * The arteriosclerosis of the vessels, is the cause of the factor, that produces the spasm, *but just what the mechanics of it is, I don't know.* * * * I don't think we know for certain why spasms do occur." Somewhat in line with the contention of the appellee, he stated: "I think it is true that if you have a man who has been engaged in exercise, in the routine activities of every day life, if he is put in bed, and forced to continue at long bed rest, the heart muscle would become flabby, and lose its tone. * * * We can't deny that taking a person away from hard manual labor, and placing him in a bed in a hospital, in strange surroundings, results in upsetting their nervous systems to some extent." Dr. Mulsow said: "Nervous changes may stop the heart beat, and result in death."

Dr. Bierring, for appellants, stated: "The cause of death was due to disease of the coronary arteries of the heart, with a sudden stoppage, causing the symptoms which have been stated, leading to death in about an hour's time." He made no attempt to explain what precipitated the sudden stoppage.

Dr. Glomset, for appellants, simply states that in his opinion death was due to heart failure, and further states that: "The exact mechanism involved in the coronary attack is not known. We have no way of knowing exactly what occurs."

The industrial commissioner and his deputy, on separate hearings, have each made written findings and decision, showing an intimate and understanding knowledge of the long and com-

plicated record, and sound reasoning in support of their conclusions of law and fact. They express their inability to find in the record tangible evidence upon which to fasten findings with any reasonable certainty, in support of the contentions of the appellants. They find sufficient competent evidential support to sustain the claim and contentions of the appellee. In the Re-opening Opinion, Decision and Award, the deputy commissioner, in speaking of the intervening precipitating cause of death, states:

"To say that it might have been a spasm of the coronary artery does not satisfy us. That is not proven or accepted by the best heart men as satisfactory explanation for the death that occurred. * * * We believe that the ultimate death in this case was brought about by a thrombosis of the left coronary artery, not at the point of its origin or near the point of its origin, but at some little distance therefrom. Otherwise death must have occurred even sooner than it did. By that we mean the attack would not have continued so long until death occurred. This is the plain and reasonable inference only to be reached from the physical facts and the opinion evidence of the medical experts who testified in the case.

"With the development of a coronary thrombosis, that is, a clotting of the blood in the coronary artery, bearing in mind the fact that the lumen of the artery was diminished until it remained only about one-fourth of its normal diameter, a clotting of blood very small indeed was all that was necessary to occlude the blood vessel, and when that occurred the nourishment to the heart muscle was removed and it began to fail. The clotting of a drop or two or three of blood was probably all that was necessary to stop the free flow of blood through the artery and we can understand the admission of the pathologist, and the statements of other medical witnesses, that the embalming process could, and we believe probably did so disturb the contents of the artery that the presence of the thrombosis was overlooked."

There is support in the record for these findings. While Dr. Mulsow, who conducted the autopsy, testified that in his opinion any blood clotting sufficient to cause death would not have been removed by the embalming process, he conceded that there could have been an embolism there which he did not find. Dr.

Parke testified that it was "perfectly possible" in the process of embalming to remove clots as well as fluid blood. Dr. Glomset, a defense witness, testified that "a blood clot in a coronary artery may be overlooked in a post mortem examination in an ordinary autopsy. I think many such clots are overlooked. * * * It is possible that only a couple or three drops of clotted blood in the blood stream would cause death if in the right place." Dr. Maher testified that the embalming fluid is corrosive and does not give as satisfactory procedure for the performing of an autopsy.

The industrial commissioner in his opinion and decision on review adopted the award and findings of fact and reasons in support thereof as stated in the deputy's decision. He also specifically found that the death of Mr. Lindeken was not brought about at the time it was because of the normal progress of the sclerosis of the left coronary artery and the descending branch thereof, but by the stoppage of the blood flow at some point therein by a blood clot formed or induced by the decreased speed and volume of the blood stream through the roughened and narrowed channel of the sclerosed vessel, and that this retardation of the blood stream was due to the enforced bed rest made necessary by the knee injury. He found that it was highly probable that any such blood clot was removed by the forcible withdrawal of the blood, and the forcible injection of the embalming fluid. In conclusion, he states: "Thus when all of the facts and circumstances are fairly considered, including the fair inferences that may be drawn from the proven facts, we are of the opinion, that the enforced bed rest, due to the injury with shock, though the latter not predominating, was a contributory factor that hastened and caused the death of claimant's husband sooner than it otherwise would have occurred. How much sooner we are unable to say, but since the thickening of the walls is one of slow process, it is reasonably probable life would have continued for at least a few years hence." The statement in the last sentence is fortified by the further fact that his life would likely have had such benefits as accrue from nature's collateral circulation asserted by several of the doctors. We think there is sufficient competent evidence to sustain the findings, order, and decree of the commissioner. This record presents a man in active and steady employment at hard

labor up to October 16, 1937, on which day he received an injury requiring confinement in a hospital. Two weeks later, he suddenly dies from a heart attack. The autopsy discloses no discernible organic changes in the condition of the heart and its circulatory system from what it may be reasonably assumed it was on October 16th, previous. Neither on that date nor on any previous date had his heart given him any trouble, so far as shown by the record. With its organic condition the same, why did it fail him on October 30, 1937? The reasonable and probable answer is that some external factor intervened to impair the serviceable functioning of that organ by the precipitation of the painful and fatal heart attack. It is agreed that the pain of such an attack is caused by the hunger of the heart muscle or some part of it for nourishing blood. The suddenness of the attack and the severity of the pain indicates that the blood supply was almost completely and abruptly shut off. The record falls far short of establishing the arterial spasm theory. But it does, in our judgment, fairly and reasonably support the decision of the commissioner that the very probable cause of the stoppage was a clotting of the blood, because of the conditions herein stated. While there is no conflict in the evidence respecting many of the facts, there is a decided conflict in the evidence adduced by the doctors in their expert opinion testimony. It was the privilege and right of the commissioner to determine the weight, credibility and the ultimate probative value of this testimony. When such a conflict in the evidence exists, the courts cannot interfere with fact finding of the commissioner. We have held this so often that citation of authority in support thereof is needless. But see Fritz v. Rath Packing Co., 224 Iowa 1116, 1117, 278 N. W. 208; Rish v. Iowa Portland Cement Co., 186 Iowa 443, 453, 170 N. W. 532, 535; Schuler v. Cudahy Packing Co., 223 Iowa 1323, 1325, 275 N. W. 39, 40; Featherson v. Continental-Keller Co., 225 Iowa 119, 279 N. W. 432.

We have also repeatedly held that though the injury aggravates or accelerates a physical impairment with which the employee is afflicted, the injury is compensable if death resulted therefrom at a time earlier than it would have occurred had not the injury been suffered. Hanson v. Dickinson, 188 Iowa 728, 176 N. W. 823; Belcher v. Des Moines Electric Light Co., 208 Iowa

262, 225 N. W. 404; Wax v. Des Moines Asphalt Paving Corp., 220 Iowa 864, 263 N. W. 333; Almquist v. Shenandoah Nurseries, 218 Iowa 724, 254 N. W. 35, 94 A. L. R. 573; West v. Phillips, 227 Iowa 612, 288 N. W. 625.

This isn't a case where the testimony was that the claimed cause *might* or *might not* or *possibly could have* brought about the death, as was Guthrie v. Iowa Gas & Electric Co., 200 Iowa 150, 204 N. W. 225, or Slack v. Percival Co., 198 Iowa 54, 199 N. W. 323, or Boswell v. Kearns Funeral Home, 227 Iowa 344, 288 N. W. 402. In this case, witnesses designate the alleged cause as the *probable* cause, or that which *did cause* the death. The cause is removed from the realm of mere possibility, and is definitely placed in the field of reasonable likelihood and probability. Counsel for appellants assert that expert opinion testimony is of a low order. This statement is as condemnatory of their witnesses as it is of the appellee's. However this court has so stated in some of its decisions, one of them as late as 1929, State v. Maharras, 208 Iowa 127, 224 N. W. 537, wherein the court was influenced perhaps by the iniquity of the crime which the expert sought to excuse. While there is expert opinion testimony and there are expert witnesses deserving severe condemnation, the indictment made, like many generalities, is too broad, inaccurate and not to be followed blindly. All expert witnesses expressing opinions should not be regarded as charlatans. There are capable, experienced and reliable men in all special fields. The vital question with such testimony, as with all other testimony, is whether it is trustworthy, convincing, and supported by sound reasons. If it is, it should receive thoughtful, conscientious, and unprejudiced consideration.

II. Appellants complain because the district court refused to set aside the decision and award of the commissioner, and to remand the case to the commissioner for proceedings before an arbitration committee. We find no error nor valid ground for complaint in this matter. Briefly stated, the procedure followed was this: The Memorandum of Agreement was executed by employee and employer on October 19, 1937, filed November 9th and approved by the commissioner November 19, 1937; the claimant, having no knowledge of this agreement, filed application for arbitration, July 11, 1938; on July 22, 1938, she withdrew the

application and filed application to reopen the case; defendants resisted this and on September 12, 1938, filed application for arbitration, which was denied by the commissioner on the same day; no appeal was taken from this ruling; reopening hearing later came on before the deputy commissioner at which evidence was introduced by both sides; defendants' motion to dismiss proceedings and for arbitration was again denied; on August 3, 1939, the deputy commissioner filed his Reopening Opinion, Decision and Award in favor of claimant; no appeal was taken therefrom by defendants; on August 7, 1939, defendants filed petition for review, which was granted over resistance of claimant, on her special appearance, on August 10, 1939, in which decision the commissioner held that the reopening hearing before the deputy should be considered as and for an arbitration hearing; no appeal was taken from the decision by the defendants; defendants gave notice of, and introduced testimony, at the review hearing before the commissioner held August 18, 1939; on September 1, 1939, the commissioner made his decision and award, from which defendants appealed to the district court.

The defendants were given every reasonable opportunity to present their defense and took full advantage thereof. They received everything they asked for, except an arbitration hearing before three arbitrators. If it be conceded, arguendo, that the defendants were not estopped by their conduct to complain, it must be said they were in no way prejudiced. The finding of an arbitration committee, whether it be composed of one or three members, is not binding on the commissioner on review. Defendants had this review. If they were deprived of any right, it was of no substance.

The order and judgment appealed from is affirmed.—Affirmed.

RICHARDS, C. J., and MITCHELL, SAGER, HAMILTON, HALE, MILLER, OLIVER, and STIGER, JJ., concur.